100 S.W.3d 658 (2003)
In the Matter of D.J.
No. 05-02-01018-CV.
Court of Appeals of Texas, Dallas.
March 28, 2003.
*661 Robert James Herrera, Herrera & Herrera, Dallas, for Appellant.
Katherine Robinson, Lori L. Ordiway and Cheryl D. Holder, Assistant District Attorneys, Dallas, for Appellee.
Before Justices JAMES, FARRIS,[1] and ROSENBERG.[2]

OPINION
Opinion by Justice FARRIS (Retired).
In eight points of error, Ginger J. (Mother) and Kelvin J. (Father) contend the judgment terminating their parental rights to D.J. must be reversed because (1) the evidence is factually insufficient to support the jury's findings that (a) Mother's and Father's parental rights should be terminated and (b) termination of the parent-child relationship was in D.J.'s best interest; and (2) the trial court erred by denying Mother's and Father's motion for new trial. We affirm the trial court's judgment terminating Father's parental rights. Because there is factually insufficient evidence that Mother engaged in any conduct that supports termination under the family code, we reverse the trial court's judgment terminating Mother's parental rights and remand the issue of the termination of Mother's parental rights to the trial court for new trial.

Factual Sufficiency Standard of Review
The parent-child relationship may be terminated if the parent has engaged in any of the conduct set out as grounds for termination in the family code and termination is in the child's best interest. Tex. Fam.Code Ann. § 161.001 (Vernon 2002). Both of these elements must be established by clear and convincing proof. Id. We must uphold the termination findings "if the evidence is such that a reasonable jury could form a firm belief or conviction that grounds exist for termination under Texas Family Code sections 161.001 and 161.206(a)." In re C.H., 89 S.W.3d 17, 18-19 (Tex.2002). We give due consideration to evidence that the factfinder could reasonably have found to be *662 clear and convincing and consider whether the disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. In re J.F.C., 96 S.W.3d 256 (Tex.2003).

ALLEGED GROUNDS FOR TERMINATION
The Texas Department of Protective and Regulatory Services (the Department) alleges Mother and Father violated sections 161.001(1)(D) and (E) of the Texas Family Code. Subsection (D) allows termination where the parent knowingly places or knowingly allows the child to remain in conditions or surroundings which endanger the physical and emotional well-being of the child. Tex. Fam.Code Ann. § 161.001(1)(D). Under subsection (D), the environment of the child must be examined to determine if it is a source of endangerment to the child. In re D.T., 34 S.W.3d 625, 632 (Tex.App.-Fort Worth 2000, pet. denied). Subsection (E) allows termination where the parent engages in conduct or knowingly places the child with persons who engage in conduct which endangers the physical or emotional well-being of the child. Tex. Fam.Code Ann. § 161.001(1)(E). It requires us to look at the parent's conduct alone, including actions or omissions. In re D.T., 34 S.W.3d at 634.

PROCEDURAL BACKGROUND
D.J. was born on February 12, 2001. On April 4, 2001, the Department removed D.J. from his parents' custody based on a diagnosis of Shaken Baby Syndrome (SBS). On April 8, 2002, the trial court entered judgment on the jury's verdict terminating Mother's and Father's parental rights to D.J. Mother and Father timely filed a motion for new trial, contending the evidence was factually insufficient to support the jury's findings. The trial court denied the motion for new trial on June 6, 2002, and Mother and Father appealed.

EVIDENCE
During birth on February 12, 2001, D.J. suffered a cephalohematoma, or a bleeding of the arteries in the scalp outside the skull. A cephalohematoma usually resolves after birth without medical intervention. D.J. was released from the hospital to his parents' care on February 14, 2001.
On April 1, 2001, D.J. was fussy most of the day due to colic. In the late afternoon, Mother dressed D.J. for a visit to family friends and left D.J. in his car seat with Father while Mother finished dressing. Father carried the car seat and D.J. into the bedroom to change D.J.'s diaper. Father unfastened D.J.'s clothes and removed D.J. from the car seat by lifting D.J. under his arms. Father held D.J. under the arms and told D.J. that "he was not going to eat anything else until we go over to Brandon & Janeen house." D.J.'s diaper was loose on one side and, as Father held D.J. in the air, D.J. had a bowel movement on himself, Father, and the bed. Father put D.J. onto the bed, but cannot recall what degree of force he used. D.J. immediately appeared lethargic and had difficulty breathing. The paramedics transported D.J. to Children's Medical Center (CMC).
Dr. Steven Leung, a pediatrician, is a part of the Referral and Evaluation of Abused Children program at CMC. At the request of the intensive care physicians, Leung examined D.J. on April 2, 2001 and diagnosed SBS. Leung testified SBS can be caused by the child being shaken or forcefully placed on a surface causing accelerating/decelerating forces to the head. A bobbing of a child's head would not by itself result in SBS. SBS requires forces greater than the child's *663 own weight and gravity be applied in a direction. The characteristics of SBS are (1) subdural hematomas, or bleeding in the brain; (2) a clinical picture of an acute event where the child goes from a healthy state to unresponsiveness or suffers a seizure; (3) retinal hemorrhages; (4) bone fractures in characteristic places such as the bones in the ends of the arms and legs; (5) brain swelling; and (6) poor brain function or an inability to breathe. The hallmarks of SBS are a change in status and subdural hematomas. SBS can cause developmental delays and seizures.
A CAT scan performed on D.J. showed one chronic, or more than two weeks old, subdural hematoma and three acute, or recent, subdural hematomas. The CAT scan plus D.J.'s medical history of nonresponsiveness suggested the acute subdural hematomas occurred within one day of the scan. Although D.J. could have suffered a subdural hematoma at birth, it would not appear on the CAT scan as an acute subdural hematoma seven weeks later. Tests performed on D.J., combined with the fact D.J. did not have a bleeding problem following his circumcision, indicated D.J. did not have an infection or a bleeding disorder that would explain the acute subdural hematomas.
Leung testified D.J. also had both central and peripheral retinal hemorrhages. Retinal hemorrhages and subdural hematomas are seen in SBS. Peripheral retinal hemorrhages are not seen with sepsis infection and would not occur at birth. D.J. was also placed on a ventilator for a brief period of time to assist him in breathing, indicating some degree of neurological impairment.
D.J. had all the characteristics of SBS other than the bone fractures and a significant amount of brain swelling. Leung testified D.J. was the victim of abuse and the injuries Leung observed in D.J. on April 1, 2001 were separate from any injuries due to D.J.'s birth trauma.
Arlene Martinez, a detective with the Child Abuse Unit of the Dallas Police Department, testified she was assigned to investigate D.J.'s injuries on April 2, 2001. She spoke to the medical personnel at CMC, Mother, and Father. Both Mother and Father gave Martinez written statements that indicated Father was alone with D.J. at the time D.J. became unresponsive.
Martinez met with Father at the police station on April 4, 2001 for a second interview. She gave Father his Miranda warning prior to the interview, which lasted fifty-one minutes. Father never requested to terminate or reschedule the interview and did not indicate he was too tired to proceed. Martinez testified that during this interview, Father never claimed D.J.'s birth injury was the cause of the April 1st injuries. At the end of the interview, Father provided a voluntary statement indicating he was not supporting D.J.'s head while holding D.J. in the air and Father "must have shook him at this point or his head could have been bobbing at this time." Father also admitted he "was moveing [sic] kind of quickly" when he placed D.J. on the bed. Father testified he had not slept in three days prior to this interview and the statement was coerced. Martinez testified that prior to Father leaving the police station, Martinez told Father criminal charges would be filed against him. Father denied this conversation.
Jamie Johnson, an investigator for Child Protective Services (CPS), testified she was assigned to investigate D.J.'s injuries on April 2, 2001. She initially met with Mother, who indicated D.J. was basically a normal child. Mother did not claim the subdural hematomas were related to D.J.'s birth and did not seem concerned about *664 D.J.'s cephalohematoma. Father told Johnson he had a criminal history relating to drug trafficking. He indicated D.J. had been fussy all day and appeared to have a seizure following the bowel movement.
On April 4, 2001, Johnson learned that Martinez was filing criminal charges against Father. Johnson went to the hospital and found Father alone with D.J. Father told Johnson that he did not recall shaking D.J., but knew he was not holding D.J. properly and was not providing proper head support. Father did not know what type of force he used when he put D.J. on the bed. Mother then entered the hospital room and said Father would not intentionally hurt D.J. Johnson testified that if Mother thought Father's actions were acceptable, then Mother would not be able to protect D.J. Johnson told Mother and Father that Father could not be alone with D.J. until Father completed parenting and anger management classes. Johnson concluded as a result of the investigation that Father caused D.J.'s injuries, and the Department removed D.J. from Mother's and Father's custody.
Dr. Nichelle Wiggins, a licensed clinical psychologist, testified she performed psychological evaluations on Mother and Father. Mother did not believe Father hurt D.J., but indicated that if he did, it was not intentional. Wiggins did not believe Mother was forthright in responding to questions Mother thought would make her or Father look negative. Father told Wiggins about his criminal convictions for selling cocaine and ecstasy. In Wiggins's opinion, Father had little understanding of his own drives and impulses, would not admit to even minor flaws, and had anger management difficulties. Both Mother and Father believed D.J.'s injuries were related to birth.
Dr. Curtis Rozzelle, a neurosurgical fellow at the University of Texas Southwestern Medical Center, testified he first examined D.J. on July 12, 2001 and, in Rozzelle's opinion, D.J. was developmentally appropriate. Rozzelle performed a CAT scan on D.J. on September 13, 2001 that revealed the subdural hematomas had resolved. Rozzelle believed D.J. had an excellent chance of developing normally; however, D.J. still had a potential risk for developmental problems that may not show up for months or years. Rozzelle believed the evidence supported the SBS diagnosis.
Noel Stressman, an early intervention specialist, testified D.J. has some developmental delays, and she believed D.J. will have more developmental delays in the future. D.J. was very sensitive to stimulation and thus did not process information from his environment well. D.J. needed a very structured, calm environment with an individual who understands developmental delays and learning differences. Stressman does not know if D.J.'s delays are due to SBS.
Beth Bontempo, a psychologist, performed a parent-child assessment on Mother, Father, and D.J. Bontempo testified Father seemed angry and controlling with Mother. Father's demeanor changed significantly when CPS caseworkers entered the room. D.J. was unhappy and cried very hard when he was held by Father. Bontempo believes Father has the potential to be explosive and could benefit from anger management classes. Bontempo testified D.J. would be at risk if he was returned to Mother and Father without the parents admitting responsibility for D.J.'s injuries.
Jan Holcomb, a teacher who worked with Mother, testified she was concerned about Mother's welfare during the 1999-2000 school year. Mother had a black eye and marks around her neck that looked like choke marks. Rebecca Newman, another *665 teacher at Mother's school, testified Mother had two black eyes and bruises on her arms and legs during the fall of 1999 and the spring of 2000. Mother told Newman that Mother and Father had lengthy arguments. Neither Holcomb nor Newman knew the cause of the bruises and did not know if Father had physically abused Mother.
Based on a conversation Vernell Miller, a Court Appointed Special Advocate (CASA) volunteer, had with Father, Miller believes Father dropped D.J. Miller testified that she observed Father become very angry with CPS caseworkers and she was afraid Father would strike one of the caseworkers. Miller believes it is in D.J.'s best interest to remain in foster care until adopted. Glenda Taylor, the CASA supervisor, testified that when Miller asked Mother what Mother would do if she found out Father shook D.J., Mother said she would have to think about it.
Natalie Witherspoon, the CPS supervisor, testified that both Mother and Father became angry when she brought up domestic violence. Witherspoon testified she had never seen anyone "blow up" like Father. Father was unable to control his anger. Witherspoon told Mother that if Mother stayed with Father, it would be difficult to regain custody of D.J. Mother chose to stay with Father. Witherspoon was concerned about domestic violence based on Mother's co-workers' accounts of bruises, the fact Father spoke to Mother in a very demeaning way, and the amount of control Father exerted over Mother. Witherspoon testified the Department's plan for D.J. was adoption and it was likely D.J. would be adopted.
Stacy Grant, a CPS caseworker, testified she was present when Father became very angry at the CPS office and was afraid Father would strike her or Witherspoon. Grant also observed Father curse Mother and order Mother to do what he said to do. Father's demeanor changed completely when the caseworker entered the room. Grant wanted Father to repeat the anger management class and testified that D.J. was at risk for future injury if Father refused to take responsibility for D.J.'s injuries. Grant also expressed concern about the stability of Mother's and Father's home. Mother and Father have moved multiple times since D.J. was removed, and Mother has failed to maintain employment. Grant believed Mother's and Father's parental rights should be terminated and that D.J. will be adopted.
George Landis, the director of marketing and communications for the Dallas Opera, testified Father was the assistant manager in telemarketing. He described Father as reliable and a peacemaker. Michelle Dequesada, the associate marketing director for the Dallas Opera, testified Father had a good work ethic and was not capable of the accused conduct. She had never seen Father lose his temper.
Janeen Heath testified she had known Father for fifteen years and that Father and Mother lived with her for four months. She described Father as nice, kind, and gentle. She trusts Father with her own children. She described Father as excited about and "totally in love with" D.J. She saw no inappropriate interaction between Father and D.J. The accusations that Father hurt D.J. are not consistent with Father's character.
Dr. John Wright, Mother's obstetrician, testified Mother and Father were enthusiastic about Mother's pregnancy. D.J. had normal scores at birth but had a cephalohematoma. There was no retinal exam at birth, but if D.J. had retinal bleeding at birth, it could still be present seven weeks later. However, it would be unusual for a birth-related problem to still be progressive more than two weeks after birth.
*666 Phyllis Thompson, Father's sister, testified Father and Mother were happy about Mother's pregnancy. Further, Father is not angry or violent, and Thompson does not believe Father shook D.J. Kenneth Johnson, Father's brother, testified Father is a fun-loving person. Father was happy about having a baby, and no one can convince Johnson that Father shook D.J. Johnson believes D.J.'s injuries were caused by the birth trauma.
Father testified he was placed on probation in 1986 for selling a controlled substance. That probation was revoked due to Father's participation in a conspiracy to sell ecstasy, and Father spent three and one-half years in a federal penitentiary. After his release from prison in 1991, Father attended the Art Institute and studied music and video production. He met Mother in early 1999 and started a sexual relationship with her while she was living with her boyfriend. Mother's boyfriend was abusive, and Mother ended that relationship in the spring of 1999. In the summer of 1999, Mother and Father started discussing having a family. Father testified he was very excited about the pregnancy and attended doctor's visits and pre-natal classes with Mother. Mother and Father married in December 2000.
Father testified he completed all the classes required by the Department. He does not have an anger problem and plans to remain with Mother. Father admitted he raises his voice when he is angry, but denied he was out-of-control at the CPS office. Father denied he ever physically abused Mother. Mother did not injure D.J., and Father would never hurt his son. Father did not shake D.J. and did not forcefully place the baby onto the bed. Father admits he and Mother have moved often since D.J.'s removal and that they owe back rent on a number of apartments.
Mother testified she has a college degree in education with a specialization in early childhood education. She first began teaching during the 1998-1999 school year. At the time she was living with a boyfriend who was physically abusive. She had been in the relationship for approximately five years but was never sexually intimate with her boyfriend. She began living with Father in early May 1999. Mother denied that Father ever abused her. Mother plans to have D.J. tested for developmental delays. She does not believe D.J. was shaken or that D.J. has developmental delays.

FATHER
A. Grounds for Termination
In point of error five, Father contends the evidence is factually insufficient to support the jury's findings that Father violated sections 161.001(1)(D) and (E) of the family code.
On April 1, 2001, D.J. became unresponsive and was taken to CMC. Medical tests showed D.J. suffered three subdural hematomas on or shortly before April 1st and had central and peripheral retinal hemorrhages. Further tests indicated there was no infection or bleeding disorder that could have caused the subdural hematomas. The three subdural hematomas and the peripheral retinal hemorrhages could not have been caused by the cephalohematoma D.J. suffered at birth. Leung testified these injuries were due to accelerating/decelerating forces to the head and diagnosed SBS.
Father was alone with D.J. at the time D.J. became unresponsive and admitted in his voluntary statement that he "must have shook" D.J. when he was holding D.J. under his arms. Further, Father admitted he placed D.J. on the bed but could not recall the amount of force he used.
*667 We conclude there is sufficient evidence upon which a reasonable jury could form a firm belief or conviction that Father engaged in conduct that endangered the physical or emotional well-being of D.J. Because the evidence was factually sufficient to support the jury's findings under section 161.001(1)(E) of the family code, it is not necessary for us to consider whether the evidence is factually sufficient to support the jury's findings under section 161.001(1)(D). See Dupree v. Tex. Dep't of Protective & Regulatory Servs., 907 S.W.2d 81, 83 (Tex.App.-Dallas 1995, no writ). We overrule point of error five.
B. Best Interest of the Child
We next determine, using the nonexclusive list of factors set out by the supreme court in Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex.1976), whether there is clear and convincing evidence that the termination of Father's parental rights is in D.J.'s best interest. The Holley test focuses on the best interest of the child, not the best interest of the parent. Dupree, 907 S.W.2d at 86. The relationship between a parent and child is one of constitutional dimensions, and we must recognize the presumption that the best interest of the child will be served by preserving the parent-child relationship. Id.
(1) The desires of the child: D.J. is too young to verbally express his desires. However, there was evidence D.J. cried "very hard" or screamed when held by Father and Father was unable to console D.J. Further, D.J. is doing well in his foster home. Miller and Grant testified it was in D.J.'s best interest to terminate Father's parental rights.
(2) The present and future emotional and physical needs of the child: Stressman testified D.J. suffered from developmental delays, would likely learn differently, and needed a routine and structure with a care-giver who understood his special needs. Stressman believed frequent moves would be difficult for D.J. Rozzelle testified that D.J.'s subdural hematomas had resolved, and he believed D.J. was developmentally appropriate. However, developmental delays from SBS can take months or years to manifest. Mother testified she did not believe D.J. had any developmental delays.
(3) The present and future emotional and physical danger to the child: Johnson, Bontempo, and Grant testified that D.J. would be at risk for further injury if D.J. was returned to Mother and Father without the parents accepting responsibility for D.J.'s injuries. Rozzelle testified that, due to his injuries, D.J. was at increased risk for serious injury if he had another trauma to the head. Leung testified that, if D.J. was released to his parents and nothing was done to deter a repeated incident, D.J. could suffer a more serious injury. There was substantial evidence Father had an anger-control problem and either shook or dropped D.J., causing D.J.'s injuries.
(4) The parenting abilities of the individual seeking custody: Father was excited about Mother's pregnancy and D.J.'s birth. Father also completed a parent education class and an anger management class. Balanced against this is the evidence Father caused D.J.'s injuries, refused to admit he injured D.J., and had an anger management problem. Further, Miller testified Father did not appear to be attached to D.J.
(5) The programs available to assist Father to promote the best interests of the child: Father attended parenting and anger management classes. However, Grant believed Father would benefit from attending the anger management class a second time. Wiggins testified she *668 could make no further recommendations on programs or counseling to assist Father because Father would not admit he had injured D.J. or that Father had even minor flaws that could be addressed.
(6) The plans for the child: The Department plans to place D.J. in an adoptive home. Father indicates he intends to remain with Mother. Mother and Father have had significant financial problems since D.J. was removed from their care. They have moved at least three times within one year. They also admitted they owe rent to several places where they lived during the last four years. Although at the time of trial Father and Mother had health insurance from Mother's former employer, they did not know how much longer they would be entitled to maintain that insurance or where they would obtain insurance after Mother's COBRA benefits expired.
(7) The acts or omissions of Father: There was clear and convincing evidence Father shook or forcefully placed D.J. on the bed, causing D.J.'s injuries. The only excuse offered for this conduct was that Father was a new parent. Father never took responsibility for any conduct that may have injured D.J.
We conclude there is sufficient evidence upon which a reasonable jury could form a firm belief or conviction that the termination of Father's parental rights was in the best interest of D.J. We overrule point of error seven.
C. Motion for New Trial
In points of error six and eight, Father contends the trial court erred in not granting Father's motion for new trial. The trial court's denial of a motion for new trial will not be disturbed on appeal absent an abuse of discretion. Strackbein v. Prewitt, 671 S.W.2d 37, 38 (Tex.1984); Tex. Sting, Ltd. v. R.B. Foods, Inc., 82 S.W.3d 644, 648 (Tex.App.-San Antonio 2002, pet. denied).
The only issue raised by Father in his motion for new trial was the evidence was factually insufficient to support the jury's findings the parent-child relationship between Father and D.J. should be terminated and that termination was in D.J.'s best interest. We have determined the evidence was factually sufficient to support the jury's findings. Accordingly, the trial court did not abuse its discretion in denying Father's motion for new trial. We overrule points of error six and eight.

MOTHER
In point of error one, Mother contends the evidence is factually insufficient to support the jury's findings that Mother violated sections 161.001(1)(D) and (E) of the family code.
As noted above, under 161.001(1)(E), we examine the acts and omissions of the parent to determine whether the parent engaged in conduct, or knowingly placed the child with persons who engaged in conduct, which endangered the physical or emotional well-being of the child. In re D.T., 34 S.W.3d at 634. There was no evidence Mother injured D.J. Accordingly, the jury's finding Mother violated section 161.001(1)(E) could be premised only on Mother knowingly placing D.J. with persons who engaged in conduct which endangered D.J.'s physical or emotional well-being.
As proof Mother knew Father posed a danger to D.J., the Department first points to evidence Father had a criminal history of selling drugs and that Father had used drugs as recently as eight months before D.J. was born. However, there was no evidence Father was selling or using drugs after D.J.'s birth. We do not believe Father's *669 past criminal conduct alone constitutes clear and convincing evidence that Mother's leaving D.J. with Father posed a danger to D.J.'s emotional or physical well-being. See id. at 636.
We have also considered the Department's claim that Father physically abused Mother prior to D.J.'s birth. Parental rights may be terminated for conduct that is directed at the other parent or for conduct that occurred prior to the child's birth. In re U.P., No. 14-02-00126-CV, ___ S.W.3d ___, ___, 2003 WL 152346, at * 9, * 10 (Tex.App.-Houston [14th Dist.] Jan. 23, 2003, no pet. h.); In re B.R., 822 S.W.2d 103, 106 (Tex.App.-Tyler 1991, writ denied). However, the evidence demonstrates only that Mother had bruises and a black eye after she began a relationship with Father. Mother did not try to hide the bruises and both Mother and Father denied any physical abuse. The two witnesses who observed the bruises did not know the cause. We conclude there is not clear and convincing evidence of physical violence between Mother and Father prior to D.J.'s birth that would cause Mother to know that leaving D.J. with Father posed a danger to D.J.'s emotional or physical well-being.
Finally, the Department relies on the fact Mother left D.J. alone with Father in the hospital room after Father's second interview with Martinez. Regardless of whether Martinez told Father that criminal charges would be filed against Father based on the injuries to D.J., there is no evidence Mother was aware that these charges would be filed. Johnson, the CPS investigative caseworker, told Mother when Mother returned to the hospital room that Father could not be alone with D.J. There is no evidence Mother left D.J. alone with Father after she was instructed not to do so. We conclude the evidence was factually insufficient to support the jury's finding Mother violated section 161.001(1)(E).
We now turn to the jury's finding Mother violated section 161.001(1)(D) of the family code by knowingly placing or knowingly allowing D.J. to remain in conditions or surroundings which endangered D.J.'s physical and emotional well-being. The Department relies on Father's criminal history, past drug use, and anger management difficulties to argue Mother knowingly placed or allowed D.J. to remain in an environment that endangered D.J.'s physical and emotional well-being. However, Father was released from prison in 1991 and there is no evidence of any subsequent arrests until the one based on the injuries to D.J. Further, the only evidence of Father's illegal drug use indicated he had not used drugs since well before D.J.'s birth. Father had been employed for four years by a subcontractor of the Dallas Opera, had received a promotion due to his performance and leadership, and was a reliable and respected employee. We conclude a reasonable jury could not have formed a firm belief or conviction that Father's criminal history and past drug use placed Mother on notice that D.J.'s home environment posed a danger to D.J.
As to Father's anger management issues, there is not clear and convincing evidence Father physically abused Mother in order to establish the environment in the home posed a danger to D.J. Further, Father's outburst in the CPS office occurred after D.J. was removed from Mother's custody and would not have provided Mother notice of any danger to D.J. prior to April 1, 2001. Although there is clear and convincing evidence Father injured D.J., there is no evidence of any prior conduct by Father that would have provided Mother notice that the environment in the home endangered D.J.
*670 We conclude the evidence is factually insufficient to support the jury's findings that Mother's parental rights should be terminated under sections 161.001(D) or (E) of the family code. However, Mother should now be aware that there is clear and convincing evidence that Father injured D.J. and that any further contact between D.J. and Father could constitute endangerment under the family code. We sustain point or error one and remand this case to the trial court for further proceedings relating to Mother's parental rights to D.J. Because we have sustained point of error one, we do not consider Mother's remaining points of error. See Tex.R.App. P. 47.1.
The judgment of the trial court terminating Father's parental rights to D.J. is affirmed. The judgment of the trial court terminating Mother's parental rights to D.J. is reversed, and the issue of the termination of Mother's parental rights is remanded for new trial.
NOTES
[1] The Honorable David F. Farris, Retired Justice, Second District Court of Appeals, Fort Worth, Texas, sitting by assignment.
[2] The Honorable Barbara Rosenberg, Former Justice, Court of Appeals, Fifth District of Texas at Dallas, sitting by assignment.