122 S.W.3d 391 (2003)
In the Interest of N.H., B.H., J.H., P.H., E.C., and A.D.C., Minor Children.
No. 06-03-00047-CV.
Court of Appeals of Texas, Texarkana.
Submitted October 20, 2003.
Decided December 2, 2003.
Rehearing Overruled December 23, 2003.
*395 Michael D. Martin, Gilmer, for Appellant.
Lana Shadwick, Texas Department of Protective and Regulatory Services, Houston, for Appellee.
Larry P. King, for B.H., N.H., & J.H.
Cliff Thomas, for P.H., E.C., & A.D.C.
Before MORRISS, C.J., ROSS and CARTER, JJ.

OPINION
Opinion by Justice ROSS.
The Texas Department of Protective and Regulatory Services filed suit to terminate the parental rights of Pavla Vrsic Chandler and Craig Higley to their four children, N.H., age sixteen, B.H., age fourteen, J.H., age thirteen, and P.H., age twelve. The suit also sought to terminate the parental rights of Pavla and Anthony Chandler to their two children, E.C., age seven, and A.D.C., age six.[1] The fathers, Craig and Anthony, signed affidavits of relinquishment of parental rights to their respective children. Their parental rights were terminated, and they have not appealed.
The termination trial was held before the court, without a jury. At the close of trial, the court found by clear and convincing evidence that termination of Pavla's parental rights to her three youngest children, P.H., E.C., and A.D.C., was in the children's best interests and that grounds existed for such termination pursuant to Section 161.001(1)(D) and (E), and Section 161.003 of the Texas Family Code. The court did not terminate Pavla's parental rights to her three oldest children, N.H., B.H., and J.H. However, these three oldest children are in institutional care with the Texas Department of Protective and Regulatory Services.
Pavla appeals, contending there was no evidence or factually insufficient evidence to support the termination of her parental rights to her three youngest children.
Grounds for Termination
Tex. Fam.Code Ann. § 161.001 (Vernon 2002) provides, in relevant part, as follows:
The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:
(1) that the parent has:
....
(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;
(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;
Tex. Fam.Code Ann. § 161.003 (Vernon 2002) provides, in relevant part, as follows:
(a) The court may order termination of the parent-child relationship in a suit filed by the Department of Protective *396 and Regulatory Services if the court finds that:
(1) the parent has a mental or emotional illness or a mental deficiency that renders the parent unable to provide for the physical, emotional, and mental needs of the child;
(2) the illness or deficiency, in all reasonable probability, proved by clear and convincing evidence, will continue to render the parent unable to provide for the child's needs until the 18th birthday of the child;
(3) the department has been the temporary or sole managing conservator of the child of the parent for at least six months preceding the date of the hearing on the termination ...;
(4) the department has made reasonable efforts to return the child to the parent; and
(5) the termination is in the best interest of the child.
"Clear and convincing evidence" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. In re C.H., 89 S.W.3d 17, 25-26 (Tex.2002).
Standards of Review
In making a no-evidence, or legally insufficient evidence, review in a parental rights termination case, we must take into consideration whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the allegations sought to be established. In re J.F.C., 96 S.W.3d 256, 265-66 (Tex.2002). We look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. Id. at 266. In so doing, we must assume the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so. Id. If, after conducting our legal sufficiency review of the evidence in the record, we determine no reasonable fact-finder could form a firm belief or conviction the matter that must be proven is true, then we must conclude the evidence is legally insufficient. Id.
When reviewing a factual sufficiency challenge to a parental rights termination, we consider the evidence the fact-finder could reasonably have found to be clear and convincing. C.H., 89 S.W.3d at 25-26. We again ask whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the allegations sought to be established. J.F.C., 96 S.W.3d at 266. In so doing, we consider whether disputed evidence is such that a reasonable fact-finder could not have resolved that dispute in favor of its finding. Id. If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. Id.
The natural right existing between parents and their children is one of constitutional dimension. See In re J.W.T., 872 S.W.2d 189, 194-95 (Tex.1994). A parent's right to "the companionship, care, custody, and management" of his or her children is a constitutional interest "far more precious than any property right." Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). Therefore, we strictly scrutinize both the termination proceedings and the involuntary termination statutes in favor *397 of the parent. Holick v. Smith, 685 S.W.2d 18, 20 (Tex.1985).
The Evidence
The State presented evidence Pavla subjected her children to a home environment where violence and threats of violence were common, and where the children did not receive a secure and nurturing environment, but where they were labeled as emotionally disturbed from an early age. Pavla presented evidence that Anthony, the father of her two youngest children, was the primary source of the violence in the home and that she had subsequently divorced him. She also presented evidence she loved her children and attempted to provide for their special needs to the best of her ability.
The evidence showed that Pavla married Craig in 1985 and that the instability in the household started a few years after that marriage and continued after Pavla's marriage to Anthony. Craig was a convicted child molester when Pavla married him, but she did not discover this until a year and a half after the marriage. She chose to stay with him, on the advice of her church leader, to give him a chance to be a good father and husband. She eventually decided to divorce Craig because of his learning difficulties and because he over-disciplined their oldest child, N.H. On learning of her plans for divorce, Craig became violent toward her. Pavla divorced Craig in 1991 and secured a protective order against him. He violated the order and was incarcerated.
Pavla married Anthony three years after her divorce from Craig. The State presented evidence of several instances where Anthony was violent, or threatened violence, toward the children, Pavla, and himself. John Watkins, a supervisor with Child Protective Services, testified regarding his continued involvement with this family. He testified that, on one occasion, Anthony injured N.H.'s lip while "cleaning" N.H.'s mouth with a bar of soap. He further testified that a lot of agitation was apparent in the home and related Pavla's account of an instance when Anthony broke a mirror, cutting his hand, and then waved his bloody fist toward his family, saying, "Do I have to show y'all blood to show y'all that I'm serious about minding me?" Watkins testified the children reported to him that violence occurred in the family on a regular basis. Watkins also testified regarding N.H.'s behavioral problems in the home, resulting in N.H.'s commitment to Terrell State Hospital.
Kayla Davis, program director with Child Protective Services, testified her department has been involved in some manner with the Chandler family for several years and had provided them homemaking, day care, therapy, residential treatment, and parenting services. She testified that the Chandlers exposed their children to physical violence in their marital relationship and that the children had suffered physical violence from Anthony, and had suffered emotional abuse from both parents. She testified regarding allegations Anthony had broken down two bedroom doors, striking B.H. and J.H. She also testified concerning allegations Anthony had squeezed P.H.'s neck and hit B.H. in the neck. Kayla testified the eight family members were living in a small trailer with two rooms designated as "time-out" rooms. She further testified that, when the children were removed from the home, the trailer was oppressively hot and very dark.
Kayla also testified to emotional abuse by Pavla. She testified there was concern within the department that Pavla wanted her children to be labeled emotionally disturbed and that she exaggerated reports, or falsely reported symptoms, to mental health professionals in order to have those *398 labels attached. She testified that all six children were labeled emotionally disturbed or learning disabled at the time of removal, but that those labels had been removed from the three youngest children since they were placed in foster care. She admitted, however, that none of the children were in institutional care at the time they were removed from the home, but that since removal the three oldest have been placed in institutional care at the determination of mental health providers and her department.
Bill Skinner, the sheriff of Wood County, testified he had made approximately twenty calls to the Chandler residence. The majority of the calls were associated with family violence, with Anthony as the alleged perpetrator.
Julianne D. Davis, a licensed professional counselor, was brought in after the children were removed from the home to counsel Pavla, D.C., E.C., and P. H., with a view toward reunification. Julianne testified that, at the beginning of her counseling session with P.H., she was very quiet, hard to engage in normal conversation or play, and was withdrawn. She testified that, in the year since P.H.'s removal, she has blossomed into a self-confident, curious, interactive person who is able to express her real feelings. Julianne also testified P.H. has developed a very secure attachment to her foster family and has learned that love can be given and received in a healthy way. Julianne testified E.C., who was seven years old at the time she began seeing her, engaged in more normal interaction from the beginning than did P.H. She testified that E.C. described her father's behavior as mean toward her mother and that she talked about the time-out room at their house. Julianne agreed this was "about a four-by-four room built out of plywood with a little carpet around it and a big light in the top."
Julianne testified that D.C., who was six years old at the time she began seeing him, was an angry child who needed and wanted to be in control of his surroundings. She testified that his self-esteem was very low and that he would call himself stupid. She related that D.C. told her about the time-out rooms and how Anthony would put a log or a piece of wood against the door and leave him in the room for long periods of time. Since his time at the foster home, he has blossomed into a normal kid with more self-confidence and more coping skills to deal with his frustration and anger. She also testified he has a healthy attachment to his foster family.
Julianne's evaluation of Pavla was that she is derelict in three main areas with regard to how she treats her children. First, she has a pattern of living, and placing her children in, a chaotic environment. Second, she makes poor choices in men who are likely to be a danger to herself and the children. Last, she cannot establish a secure and nurturing attachment to her children. Julianne described Pavla's choices of husbands as dangerous to herself and her children. She described how Pavla would minimize the risks of her husbands' behavior by either not pressing charges against them or by backing down on the volatility of the situation.
Julianne described how Pavla saw her children as troubled and sought out mental health professionals to provide direction and guidance in what she should do. Julianne testified she believed Pavla tried to carry out what she thought was best for her children, but did so with her own agenda in mind. Julianne testified that Pavla inaccurately characterized her children's behaviors to mental health professionals and that relationships with such professionals were strained due to Pavla's aggressiveness in trying to get the answers she wanted to hear.
*399 Julianne also expressed the opinion Pavla does not have the ability to establish a secure, nurturing attachment to her children. She based that opinion on her observations that, although Pavla loves her children, she has no real emotional bond to them. She described how the three youngest children do not have an emotional attachment to their mother as the secure care-giver in their lives. She described how P.H. does not want to return home to her mother and how D.C. wanted to return home to his mother to see his toys, but then wanted to return to the foster home. She also testified that, after E.C. had returned home to Pavla at Christmas and had opened her presents, she then wanted to return to the foster home. The three oldest children, however, N.H., B.H., and J.H., all testified in court they missed their mother and wanted to return home.
Paul Andrews, a clinical psychologist, did evaluations of the whole family for Child Protective Services. He testified he believed Pavla knowingly placed or allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children and that she also placed the children with persons who engaged in conduct which endangered their physical or emotional well-being. Andrews cited a pattern of chaos in the family, with conflict between the stepfather and mother, at times resulting in abuse. He testified that children need a stable, supportive environment and that, with the chaos in the Chandler house, the preoccupation of everyone must have been for safety. He also testified there is a fairly consistent record the children have been removed from treatment, or not provided treatment directed by physicians, and a lack of cooperation with treating professionals, all of which places the children in emotional and physical danger. He testified Pavla has features of a paranoid personality and of an obsessive-compulsive personality disorder, which prevent her from giving the proper nurturing and caring to the children.
Carlton Smith, a Court Appointed Special Advocates (CASA) volunteer and guardian ad litem for the children, testified he had worked with the family for several months. He expressed his opinions that Pavla had knowingly placed or allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being and that she had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. It was his opinion it was in the children's best interests to terminate Pavla's parental rights. He based his opinion on Pavla's "compulsive, controlling personality," his belief Pavla would not protect the children from Anthony, whom he regarded as a physical danger to the children, and on the children's wishes.
Pavla called William Ernest Ritter, a leader in her church and a retired school superintendent, as a witness on her behalf. He testified he did not believe Pavla had knowingly placed or knowingly allowed her children to remain in conditions or surroundings which would endanger their physical or emotional well-being. Neither did he believe she had engaged in conduct or knowingly placed the children with persons that engaged in conduct which endangered their physical and emotional well-being. Ritter stated he believed Pavla loves her children. He never heard her raise her voice at her children, but he also admitted he had never seen her outwardly show love for her children.
Anthony, the father of the two youngest children, testified Pavla was very attentive to their children, played with them, helped them with homework, and showed love *400 toward them. He also testified that, until the time the children were removed from the home, they were all doing very well, receiving honors in school, and none were in residential treatment. Anthony denied many of the allegations of abuse made against him, including the allegation he barricaded the children in the time-out rooms. He did not deny the stresses on him and the family or his threats of suicide. He described the stresses on the family, including his lack of employment, his depression that coincided with his unemployment, transportation difficulties, Pavla's problem pregnancies, the children having problems at school, and worry over whether Child Protective Services was going to take the children away based on false allegations.
Anthony also testified regarding his suicide attempts. He testified that, on one occasion, he threatened to drive his car off a bridge or run it into a tree. On another occasion, he threatened to kill himself with a butcher knife. Another time, he struck Pavla's mother on the head, threatened to kill himself, and threatened to cut Pavla's throat if she called the police. This latter incident led to Anthony's incarceration, Pavla divorcing him, and the parental termination proceedings. Anthony testified that the divorce was finalized in November 2001, before his release from jail, and that he has not had contact with Pavla since, except by telephone to discuss the children.
Pavla testified the majority of the allegations of physical or emotional abuse were against Anthony, whom she divorced and against whom she obtained a protective order. However, she also testified regarding the chaos in the house and the many instances when Anthony threatened violence against himself and his family. Pavla testified she knew Anthony had used a two-by-four board to keep J.H. in the time-out room for about fifteen minutes. She admitted calling the police at least three times because Anthony threatened to commit suicide and described two of these incidents. One occurred in May 2000, when she and Anthony were talking in the car outside their mobile home. He was very depressed, and she contacted the police on a cell phone. Anthony went inside the house and obtained a butcher knife. Pavla assumed the children saw him get the knife. Anthony returned outside and told Pavla to tell the police he would "slit" his throat if they tried to arrest him. Pavla talked Anthony into dropping the knife. When the police arrived, Anthony ran toward the mobile home, yelling he was going to get "another knife to kill myself." A police officer tackled him, suffering a broken collarbone in the process.
The other incident occurred July 17, 2001. Anthony had not taken his medication and became very upset. He grabbed Pavla by her shirt and ripped it. The children and Pavla's mother were present, and Pavla's mother made a comment to Anthony regarding his unemployment. Anthony then struck Pavla's mother on the back of her head with his hand. He allowed Pavla to leave the house, but told her that, if she called the police, he would "slit [her] throat." Pavla did call the police, and when they arrived, the children had left the house, but Anthony and Pavla's mother were still inside and Anthony had a knife. The police eventually talked Anthony into relinquishing the knife.
On cross-examination, Pavla admitted several other incidents where she called the police because of Anthony's abusive behavior. On May 26, 1996, Pavla called the sheriff's office and complained Anthony had become angry and abusive, and had begun throwing objects, punched a hole in *401 the wall, and twisted J.H.'s arms and B.H.'s arms. On April 23, 2000, Pavla called the police and complained Anthony had shoved her into the bedroom, pushed her onto the bed, and begun yelling and screaming at her about other men. The children were in the living room with their grandmother when this occurred. The next day, Pavla contacted the police and informed them Anthony had kept her in the car from 10:00 a.m. to 4:30 p.m. and threatened to cut himself open with a knife and say she had done it, if she called the police. On November 11, 2000, Anthony phoned Pavla at her mother's residence and told her she was going to lose her home because he was going to burn it right after he killed her. There were also several other incidents where Pavla felt Anthony was abusive to the children or her and she had telephoned the police.
Analysis
To terminate parental rights, the evidence must establish: (1) a statutory ground for termination; and (2) the termination is in the child's best interest. Tex. Fam.Code Ann. § 161.001(1), (2). In this appeal, Pavla focuses on the statute's first prong, contending the evidence supporting the statutory grounds for termination is legally and factually insufficient. Pavla does not contend termination of her parental rights is not in her children's best interests.
The trial court found there was clear and convincing evidence for termination pursuant to Tex. Fam.Code Ann. § 161.001(1)(D) and (E), and § 161.003. Only one statutory ground is required to terminate parental rights. See, e.g., In re S.F., 32 S.W.3d 318, 320 (Tex.App.-San Antonio 2000, no pet.) (concluding "only one finding alleged under section 161.001(1) is necessary to a judgment of termination"). Therefore, we will affirm the trial court's order of termination if there is legally and factually sufficient evidence on any of the statutory grounds on which the trial court relied in terminating Pavla's parental rights. See id.
"Endangerment" is an element that must be shown under both subsections (D) and (E) of Section 161.001(1). In an involuntary termination proceeding, "endanger" means conduct that is more than a threat of metaphysical injury or the possible ill effects of a less than ideal family environment. Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987). However, the child need not suffer actual physical injury to constitute endangerment. Id. "Rather, `endanger' means to expose to loss or injury; to jeopardize." Id.; see also In re M.C., 917 S.W.2d 268, 269 (Tex.1996). Endangerment can occur through both the acts and omissions of the parent. Phillips v. Tex. Dep't of Protective & Regulatory Servs., 25 S.W.3d 348, 354 (Tex.App.-Austin 2000, no pet.). Neglect can be just as dangerous to a child's well-being as direct abuse. M.C., 917 S.W.2d at 270.
Tex. Fam.Code Ann. § 161.001(1)(D) applies only to the acceptability of a child's living conditions or surroundings; it does not apply to the conduct of the parent toward the child. In re S.H.A., 728 S.W.2d 73, 84 (Tex.App.-Dallas 1987, writ ref'd n.r.e.). Under subsection (D), it must be the environment itself that causes the child's physical or emotional well-being to be endangered, not the parent's conduct. Id. at 84-85. Thus, subsection (D) can only be utilized as a ground for termination if the child is placed in conditions or surroundings that are themselves dangerous to his or her physical or emotional well-being; parental conduct alone is insufficient under this subsection. See In re T.L.H., 630 S.W.2d 441, 446 (Tex.App.-Corpus Christi 1982, writ *402 dism'd) (interpreting predecessor statute with identical language). The environment must pose a real threat of injury or harm to the child, Williams v. Tex. Dep't of Human Servs., 788 S.W.2d 922, 926 (Tex. App.-Houston [1st Dist.] 1990, no writ), overruled on other grounds, In re J.N.R, 982 S.W.2d 137, 143 (Tex.App.-Houston [1st Dist.] 1998, no pet.), and there must be proof of a direct causal connection between the environment in which the child is placed or allowed to remain and the resulting danger to the child's physical or emotional well-being to warrant termination under subsection (D). Ybarra v. Tex. Dep't of Human Servs., 869 S.W.2d 574, 577-78 (Tex.App.-Corpus Christi 1993, no writ); S.H.A., 728 S.W.2d at 85. However, it is not necessary for the parent to have certain knowledge an actual injury is occurring; it is enough the parent was aware of the potential for danger to the child in such environment and disregarded that risk. In re Tidwell, 35 S.W.3d 115, 119-20 (Tex.App.-Texarkana 2000, no pet.).
By contrast, when reviewing a finding under Tex. Fam.Code Ann. § 161.001(1)(E), the focus is exclusively on the parent's conduct, not the child's environmental surroundings. In re P.S., 766 S.W.2d 833, 835 (Tex.App.-Houston [1st Dist.] 1989, no writ). Subsection (E) does not require there be danger of physical harm; proof of conduct that endangers a child's emotional well-being alone is sufficient. Tex. Fam.Code Ann. § 161.001(1)(E); S.H.A., 728 S.W.2d at 85. The cause of the danger to the child's physical or emotional well-being, however, must be the parent's conduct by way of actions, inactions, or omissions. See S.H.A., 728 S.W.2d at 85. But the specific danger to the child's well-being need not be established as an independent proposition; it may be inferred from parental misconduct. See Boyd, 727 S.W.2d at 533. In addition, it is not necessary that the conduct was directed at the child at issue or that the child actually suffered injury. Id. "Endanger" in this context means "to expose to loss or injury; to jeopardize." Id. Thus, there is no requirement of any "actual and concrete" threat of injury to the child's physical or emotional well-being. Id.; Dir. of Dallas County Child Protective Servs. Unit of Tex. Dep't of Human Servs. v. Bowling, 833 S.W.2d 730, 733 (Tex.App.-Dallas 1992, no writ). In short, subsection (E) is satisfied simply by proof that a parental course of conduct endangered a child's physical or emotional well-being. Boyd, 727 S.W.2d at 534; In re R.D., 955 S.W.2d 364, 368 (Tex.App.-San Antonio 1997, pet. denied); Bowling, 833 S.W.2d at 733.
Applying the standards set out above, we hold the evidence both legally and factually sufficient to support the trial court's finding that Pavla endangered her children's physical or emotional well-being. Pavla points out there is little evidence she personally committed any direct physical or emotional abuse of the children. The trial court could have found, however, that her conduct, as summarized above, jeopardized the children's well-being.
In order for parental conduct to constitute endangerment of the children's well-being, the conduct need not be directed at the children and the children need not actually suffer injury. Rather, endanger means to expose to loss or injury, to jeopardize. See In re N.K., 99 S.W.3d 295 (Tex.App.-Texarkana 2003, no pet.). In In re D.J., 100 S.W.3d 658 (Tex.App.-Dallas 2003, pet. denied), the Dallas Court of Appeals found there was no evidence the mother had abused her child, or should have known the father may have abused the child. The court, therefore, did not terminate the mother's parental rights. Id. at 670. In this case, however, Pavla *403 knew of Anthony's depression and abusive behavior. She reported that behavior to the Wood County Sheriff's Office for more than four years. Even in light of the potential harm Anthony posed to the children's emotional and physical health, she continued to expose them to that environment. In such cases, this Court has upheld the termination of a parent's rights on the grounds of endangerment under subsections (D) and (E). See Tidwell, 35 S.W.3d at 119-20 (finding mother endangered children by leaving them with her family when she was aware of allegations of sexual abuse against them).
Pavla points out she has sought to improve her situation and provide a better environment for her children. She divorced Anthony and obtained a protective order against him. She complied with everything Child Protective Services wanted her to do in the hopes of reunification with her children. She attended a battered women's group for six months, was evaluated by a clinical psychologist, attended homemaker lessons, went to court, visited her children each week, and corrected all the conditions in the home which the health department determined might be dangerous. Nonetheless, looking at the evidence in the light most favorable to the trial court's finding, we find the evidence of a continued abusive environment in the home was sufficient for a reasonable trier of fact to form a firm belief or conviction that Pavla knowingly allowed her children to remain in conditions which endangered their physical or emotional well-being and that she knowingly placed her children with persons who engaged in conduct which endangered their physical or emotional well-being. We further find, in light of the entire record, the disputed evidence is such the trial court could reasonably have resolved that dispute in favor of its findings under Section 161.001(1)(D) and (E) of the Texas Family Code. Hence, we find the evidence in support of the court's findings pursuant to those provisions of the Family Code both legally and factually sufficient.
Because only one statutory ground is required to terminate parental rights, we find it unnecessary to discuss the sufficiency of the evidence supporting termination pursuant to Section 161.003.
We affirm the judgment.
NOTES
[1] The ages of the children are stated as of the date of the court's order of termination.