**In the Interest of A.A.T., L.L.T., A.C., and W.L.C., Jr., Children.**

No. 06–04–00107–CV.

Court of Appeals of Texas, Texarkana.

Submitted March 22, 2005.

Decided April 26, 2005.

Pamela Fisk, Texarkana, for appellant.

Bobby Lockhart, Bowie County Dist. Atty., Texarkana, Duke E. Hooten, Department of Family and Protective Services, Special Litigation Unit, Austin, Thomas F. Loose, Locke Liddell & Sapp, LLP, Dallas, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Justice ROSS.

Weldon and Lisa Clements appeal from the termination of their parental rights. They contend that the evidence is factually insufficient to support a finding that one of the grounds for termination existed and that the evidence was factually insufficient to support a finding that it was in the best interests of the children to terminate the Clementses' parental rights.

Lisa is the mother of all four children, A.A.T., a female born December 10, 1993, L.L.T., a female born September 18, 1995, A.C., a female born February 17, 1997, and W.L.C., Jr., a male born February 16, 1999. Weldon is the father of the two youngest children.[1] The order terminated Lisa's rights to all four children and Weldon's rights to the two youngest children.

The Texas Family Code provides, in relevant part, as follows:

> The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:
>
> (1) that the parent has:
>
> . . . .
>
> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;
>
> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;
>
> . . . .
>
> (M) had his or her parent-child relationship terminated with respect to

> another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state;
>
> and
>
> (2) that termination is in the best interest of the child.

TEX. FAM.CODE ANN. § 161.001 (Vernon 2002).

The grounds stated in the trial court's order terminating Lisa's parental rights track these sections of the Family Code. The order terminating Weldon's parental rights mirrors the order terminating Lisa's rights, except it does not include subparagraph (M).

## Standards of Review

■ When reviewing a factual sufficiency challenge to a parental rights termination, we consider the evidence the fact-finder could reasonably have found to be clear and convincing. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex.2002). "Clear and convincing evidence" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *Id.; In re J.F.C.*, 96 S.W.3d 256, 266 (Tex.2002); *In re N.H.*, 122 S.W.3d 391, 396 (Tex.App.-Texarkana 2003, pet. denied). In so doing, we consider whether disputed evidence is such that a reasonable fact-finder could not have resolved that dispute in favor of its finding. *J.F.C.*, 96 S.W.3d at 266; *N.H.*, 122 S.W.3d at 396. If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably

---

1. The record shows that Lisa had previously had two other children and that her parental rights to those children were terminated earlier. The two children not fathered by Weldon in this termination proceeding were fathered by two other men, neither of whom have appealed from the termination of their parental rights.

have formed a firm belief or conviction, then the evidence is factually insufficient. *J.F.C.,* 96 S.W.3d at 266; *N.H.,* 122 S.W.3d at 396.

### The Evidence in this Case

■ The record shows that, at the time Lisa and Weldon began a relationship, Weldon was married to Jo, and Lisa had already given birth to four children by other men. In early 1997, Lisa moved into the home with Weldon and Jo. Jo testified that she did not know of her husband's affair with Lisa and that she let Lisa move in because they thought Child Protective Services (CPS) was about to take Lisa's children away from her.[2] Lisa was pregnant at the time, and gave birth to A.C. while living with Weldon and Jo. After the birth of A.C., Weldon admitted he had fathered the child. Lisa and the two older children then moved out of the house into a mobile home. Weldon and Jo kept A.C. for three years. The affair continued. Ultimately, Weldon and Jo divorced, Weldon married Lisa, and W.L.C., Jr., was born.

CPS had ongoing investigations of Lisa and her child-rearing practices during this time. Weldon was also a subject of CPS investigations after he and Lisa began their relationship. There is evidence Lisa left her children with her parents in housing described by all parties as filthy and a dangerous place for children. The evidence shows she sometimes left the two older children with her parents while she went with truckers for three or four days at a time.

There is evidence that Lisa "slapped [A.A.T.] so hard, she hit the wall," that she was "always beating" on A.A.T. with a belt or her hand, that she kicked A.A.T.'s legs from beneath her and made her fall, and

that she and Weldon laughed about it. There is also evidence that Lisa threw a chair at A.C. There was proof that Lisa had hit the children on the face or head with an open hand. The evidence also shows that Lisa once locked all the children in the car when the temperature was almost 100 degrees Fahrenheit. There is also evidence that Lisa engaged in sexual play in front of A.C.

The children reported that their parents would team them up and make them fight in front of them. There was evidence of domestic discord between Lisa and Weldon, and evidence that Weldon had once pulled a gun after Lisa cut him with a knife.

The record also shows that the State had referred Lisa to parenting classes and provided her with intensive family services to assist her with her parenting, and that she generally did not follow through with any of these activities. There was also evidence of a number of complaints filed against Lisa about her family from 1994 until 2000.

Donald Winstead, Ph.D., a psychologist, evaluated both Lisa and Weldon as having borderline intelligence. He also expressed worry about Lisa's pattern of getting romantically involved with pedophiles. There was contradictory evidence about whether the girls had been abused by Weldon. There was evidence A.A.T. had accused Weldon of sexual abuse, as had L.L.T. and A.C. CPS labeled these claims as "unable to determine."

A department investigator, Samantha Henry, testified A.C. had complained that Lisa treated her differently than her other children. A.C. also reported to her that Lisa had pushed a kitchen table against

2. This appears to have been in part because two of Lisa's previous lovers had been sent to prison for sex-related crimes.

her stomach and pinned her against the wall, and that Weldon hit Lisa with a mop to make her stop. A.C. also told Henry that she had told her school counselor about Weldon touching her private parts and that she got into big trouble. School personnel told Henry that A.C. cursed, masturbated, and exposed herself to other students.

There was also evidence that W.L.C., Jr., acted out sexual behavior with his sisters after being placed in foster care. The foster parents testified they had seen major behavioral improvements in the children's behavior since being placed in their care, and that the girls said they were afraid to go home.

Another CPS specialist, Linda Holley, testified about the extended efforts by the State to provide assistance for Lisa and Weldon (as well as to Lisa's previous lovers) and testified that, based on her experience and observation of the children, she had no doubt that A.A.T. and L.L.T. had been sexually abused and that all of them had been emotionally abused. It was also her opinion that there had been physical abuse in the household.

The various witnesses for the State all concluded that the children's best interests would be served by terminating Lisa's and Weldon's parental rights. Holley testified that these were the most traumatized children with whom she had worked.

The evidence as set out above provides clear and convincing proof that both parents engaged in conduct which endangered the physical or emotional well-being of the children. There is also clear and convincing evidence that both parents allowed the children to remain in conditions that endangered their physical or emotional well-being and that both intentionally left the children with persons (Lisa's parents) who engaged in conduct which endangered the physical or emotional well-being of the children.

There is some evidence that tends to throw doubt on portions of the State's evidence. We conclude, however, that the disputed evidence is not so significant that a reasonable fact-finder could not have reasonably resolved the dispute in the evidence in favor of the findings that resulted in termination. The evidence is clear and convincing that termination of the parental rights of both parents was in the best interests of the children.

We affirm the judgment.