2NO. 12-04-00263-CV
 
IN THE COURT OF APPEALS

TWELFTH COURT OF APPEALS DISTRICT

TYLER, TEXAS

§APPEAL FROM THE 294TH


IN THE INTEREST OF A.L.W.                    §     JUDICIAL DISTRICT COURT OF
& E.L.W., IV., MINOR CHILDREN

§VAN ZANDT COUNTY, TEXAS 




MEMORANDUM OPINION
            Edward Lowell Wright, III appeals the termination of his parental rights. In seven issues,
Edward challenges the order of termination. We affirm.
 
Background
            Edward and Tina Loree Peterson are the parents of a daughter, A.L.W., born on May 6,
1995, and a son, E.L.W., IV (“E.L.W.”), born on June 24, 1997. Edward and Tina never married. 
On December 31, 1998, Edward began serving a ninety-two month sentence in federal prison. 
According to an affidavit by Robert Baer, a specialist with the Texas Department of Protective and
Regulatory Services (the “Department”), on August 21, 2001, the Department received a report
alleging that Tina had physically abused A.L.W. The report stated that Tina hit A.L.W. with her
fist, knocking her to the ground, and then kicked her while she was on the ground. An
investigation revealed that Tina was arrested for injury to a child after the incident. The conclusion
of the investigation was “reason to believe,” and the case was referred to family-based safety
services. However, Baer reported that the case was closed when Tina was released from jail. 
According to Baer’s affidavit, Tina was under court orders not to be around the children. 
            On October 31, 2002, the Department received a report alleging neglectful supervision of
the children by Tina. The report alleged that in August, Tina had a party during which she left the
children unattended, and they jumped into a swimming pool. The Department learned that on
August 21, both A.L.W. and E.L.W. almost drowned and had to be life-flighted to Children’s
Medical Center in Dallas, Texas. According to Baer, the incident report from the Kaufman County
Sheriff’s Office stated that Tina smelled of alcohol at the time. According to witness statements,
the children were alone at the swimming pool when the incident occurred. Other people found the
children in the pool, unconscious. During the investigation, the Department also learned that,
contrary to court orders, Tina had been living with the children since being released from jail. On
November 14, 2002, Tina agreed that the children could reside with relatives of her ex-husband,
Steve Peterson, and agreed to have no unsupervised contact with the children. On December 13,
2002, the Department discovered that Tina had violated the safety plan and taken the children. 
Tina and both children were living with Steve Peterson and Glen Barrett, who was Tina’s
paramour. Baer learned that Tina planned to take the children to live with an adult daughter in
Arkansas. Baer further discovered that the daughter’s husband had been investigated for physical
abuse of his own children and that the conclusion of the investigation was “reason to believe.” 
Because of the risk of harm to the children, the Department removed A.L.W. and E.L.W. from the
home.
            On December 16, 2002, the Department filed an original petition for protection of a child,
for conservatorship, and for termination of the parent-child relationship between both parents and
both children. A trial began on June 1, 2004. Tina did not appear at trial, but was represented by
counsel. The trial court found by clear and convincing evidence that Edward had knowingly
placed or knowingly allowed the children to remain in conditions or surroundings which
endangered the physical or emotional well-being of the children, engaged in conduct or knowingly
placed the children with persons who engaged in conduct which endangered the physical or
emotional well-being of the children, and knowingly engaged in criminal conduct that resulted in
his conviction of an offense and confinement or imprisonment and inability to care for the children
for not less than two years from the date of filing the petition. The trial court also found by clear
and convincing evidence that termination of the parent-child relationship between Edward and
A.L.W. and E.L.W. was in the children’s best interest. Thus, the trial court ordered termination. 
Further, the trial court also ordered that the parent-child relationship between Tina and the children
be terminated. This appeal followed.
 
Termination of Parental Rights
            Involuntary termination of parental rights embodies fundamental constitutional rights. Vela
v. Marywood, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), pet. denied per curiam, 53 S.W.3d
684 (Tex. 2001); In re J.J., 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). A
termination decree is “complete, final, irrevocable [and] divests for all time the parent and child
of all legal rights, privileges, duties, and powers with respect to each other except for the child’s
right to inherit.” Wiley v. Spratlan, 543 S.W.2d 349, 352 (Tex. 1976); In re Shaw, 966 S.W.2d
174, 179 (Tex. App.–El Paso 1998, no pet.). Because a termination action “permanently sunders”
the bonds between a parent and child, the proceedings must be strictly scrutinized. Wiley, 543
S.W.2d at 352; In re Shaw, 966 S.W.2d at 179. However, parental rights are not absolute, and it
is vital that the emotional and physical interests of the child not be sacrificed at the expense of
preserving that right. In re C.H., 89 S.W.3d 17, 26 (Tex. 2002).
            Section 161.001 of the Family Code permits a court to order termination of parental rights
if two elements are established. Tex. Fam. Code Ann. § 161.001 (Vernon 2002); In re J.M.T.,
39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any
one of the acts or omissions itemized in the first subsection of the statute. Tex. Fam. Code Ann.
§ 161.001(1) (Vernon 2002); Green v. Texas Dep’t of Protective & Regulatory Servs., 25 S.W.3d
213, 219 (Tex. App.–El Paso 2000, no pet.); In re J.M.T., 39 S.W.3d at 237. Second, termination
must be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(2) (Vernon 2002); In
re J.M.T., 39 S.W.3d at 237. Additionally, both elements must be established by clear and
convincing evidence, and proof of one element does not alleviate the petitioner’s burden of proving
the other. Tex. Fam. Code Ann. §161.001; Wiley, 543 S.W.2d at 351; In re J.M.T., 39 S.W.3d
at 237. 
            Due process requires a petitioner to justify termination by clear and convincing evidence
because termination is such a drastic remedy. In re J.M.T., 39 S.W.3d at 237. The clear and
convincing standard for termination of parental rights is both constitutionally and statutorily
mandated. Tex. Fam. Code Ann. § 161.001; In re J.J., 911 S.W.2d at 439. Clear and convincing
evidence means “the measure or degree of proof that will produce in the mind of the trier of fact a
firm belief or conviction as to the truth of the allegations sought to be established.” Tex. Fam. Code
Ann. § 101.007 (Vernon 2002). There is a strong presumption that the best interest of the child is
served by preserving the parent-child relationship. Wiley, 543 S.W.2d at 352; In re J.M.T., 39
S.W.3d at 240. Thus, the burden of proof is upon the party seeking to terminate. In re J.M.T., 39
S.W.3d at 240.
Standard of Review
            When confronted by both a legal and a factual sufficiency challenge, an appellate court must
first review the legal sufficiency of the evidence. Glover v. Texas Gen. Indem. Co., 619 S.W.2d
400, 401 (Tex. 1981); In re M.D.S., 1 S.W.3d 190, 197 (Tex. App.–Amarillo 1999, no pet.). 
Because termination findings must be based on clear and convincing evidence, the standard of
review is not the same on appeal as a finding based upon a preponderance of the evidence. In re
J.F.C., 96 S.W.3d 256, 264 (Tex. 2002). Therefore, in conducting a legal sufficiency review, we
must look at all the evidence in the light most favorable to the finding to determine whether a
reasonable trier of fact could have formed a firm belief or conviction that its findings were true. Id.
at 266. We must assume that the fact finder settled disputed facts in favor of its finding if a
reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have
disbelieved or found incredible. Id. This does not mean that we are required to ignore all evidence
not supporting the finding because that might bias a clear and convincing analysis. Id.
            The appropriate standard for reviewing a factual sufficiency challenge to the termination
findings is whether the evidence is such that a fact finder could reasonably form a firm belief or
conviction about the truth of the petitioner’s allegations. In re C.H., 89 S.W.3d at 25.  In
determining whether the fact finder has met this standard, an appellate court considers all the
evidence in the record, both that in support of and contrary to the trial court’s findings. Id. at 27-29. 
Further, an appellate court should consider whether disputed evidence is such that a reasonable fact
finder could not have reconciled that disputed evidence in favor of its finding. In re J.F.C., 96
S.W.3d at 266. 
            This standard retains the deference an appellate court must have for the fact finder’s role. 
In re C.H., 89 S.W.3d at 26. Additionally, the trier of fact is the exclusive judge of the credibility
of the witnesses and the weight to be given their testimony. Nordstrom v. Nordstrom, 965 S.W.2d
575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied). Thus, our review must not be so
rigorous that only fact findings established beyond a reasonable doubt could withstand review. In
re C.H., 89 S.W.3d at 26.
 
Termination Under Sction 161.001(1)(D)
            In his first and second issues, Edward contends that the evidence is legally and factually
insufficient to support a finding that he knowingly placed or knowingly allowed the children to
remain in conditions or surroundings which endangered their physical or emotional well-being.
Applicable Law
            Section 161.001(1)(D) of the Texas Family Code states that the court may order termination
of the parent-child relationship if the court finds by clear and convincing evidence that the parent
has knowingly placed or knowingly allowed the child to remain in conditions or surroundings which
endanger the physical or emotional well-being of the child. Tex. Fam. Code Ann. §161.001(1)(D)
(Vernon 2002). This provision addresses the child’s surroundings and environment, rather than
parental conduct. In re N.R., 101 S.W.3d 771, 775-76 (Tex. App.-Texarkana 2003, no pet.); In
re R.D., 955 S.W.2d 364, 367-68 (Tex. App.–San Antonio 1997, pet. denied); Ybarra v. Texas
Dep’t of Human Svcs., 869 S.W.2d 574, 577 (Tex. App.–Corpus Christi 1993, no writ). 
            “Endanger” means to expose to loss or injury or to jeopardize. Texas Dep’t of Human
Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987); In re D.M., 58 S.W.3d 801, 811 (Tex. App.–Fort
Worth 2001, no pet.). “Endanger” means more than a threat of metaphysical injury or the possible
ill effects of a less-than-ideal family environment. Boyd, 727 S.W.2d at 533; In re D.M., 58
S.W.3d at 811. Nonetheless, it is not necessary that the conduct be directed at the child or that the
child actually suffers injury. Boyd, 727 S.W.2d at 533; In re J.J., 911 S.W.2d at 440. Rather, it is
sufficient that the child’s well-being be jeopardized or exposed to loss or injury. In re J.J., 911
S.W.2d at 440.
            When seeking termination, the Department must show that the child’s living conditions pose
a real threat of injury or harm. In re N.R., 101 S.W.3d at 776; Ybarra, 869 S.W.2d at 577. Further,
there must be a connection between the conditions and the resulting danger to the child’s emotional
or physical well-being. Ybarra, 869 S.W.2d at 577-78. It is sufficient that the parent was aware
of the potential for danger to the child in such environment and disregarded that risk. In re N.R.,
101 S.W.3d at 776. The relevant time frame to determine whether there is clear and convincing
evidence of endangerment is before the child was removed. Ybarra, 869 S.W.2d at 577.
            Abusive or violent conduct by a parent or other resident of a child’s home can produce an
environment that endangers the physical or emotional well-being of a child. D.O. v. Texas Dep’t
of Human Svcs., 851 S.W.2d 351, 354 (Tex. App.–Austin 1993, no writ); In re B.R., 822 S.W.2d
103, 106 (Tex. App.–Tyler 1991, writ denied). We have previously concluded it is illogical to
reason that inappropriate, debauching, unlawful, or unnatural conduct of persons who live in the
home of a child, or with whom a child is compelled to associate on a regular basis in his home, is
not inherently a part of the “conditions and surroundings” of that place or home. In re B.R., 822
S.W.2d at 106. Further, an environment that routinely subjects a child to the probability that he will
be left alone because his parents are once again jailed endangers both the physical and emotional
well-being of a child. In re S.D., 980 S.W.2d 758, 763 (Tex. App.–San Antonio 1998, pet. denied). 
Conduct that results in such a disability, and that subjects a child to a life of uncertainty and
instability, endangers the child’s physical or emotional well-being. Id.
Analysis
            At trial, Edward testified that, after observing Tina using drugs while pregnant with E.L.W.,
Edward “removed [himself] from the situation.” In 1998, after Edward was released from prison,
he lived with Tina, both children, and two other people. He usually slept in the room with one of
the babies, and the other baby was in the front room. Everyone else, including Tina, would be in
the back bedroom using drugs. He believed Tina was a drug addict, and both children were born
during Tina’s drug use. According to Edward, he observed Tina using cocaine and smoking and
injecting methamphetamine from 1997 through 1998 over twenty times. Edward insisted that he
protected his children when Tina was using drugs because he would not let anything happen to
them. However, he admitted that he did not remove them from the home.
            Edward stated that Tina received probation for felony criminal mischief or, more
specifically, running down the garage door at a Dallas Police Department sally port garage with her
oldest daughter and an infant A.L.W. in the vehicle. This incident occurred in 1995, shortly after
A.L.W. was born and while Edward was still incarcerated. From 1997 to 1998, Edward never
called Tina’s probation officer or the police regarding her drug use. Nor did he take Tina to the
emergency room and ask for help for her drug use. Edward testified that he first began trying to get
the children out of their situation when Tina was arrested in May 2001 for possession of drugs or
drug paraphernalia. Edward stated that he contacted Baer after the injury to a child case in August
2001 and wrote Baer in November 2002. Further, he called the Department about five or six times. 
He testified that he also reported alleged incidents such as Steve’s abuse of A.L.W. and A.L.W.’s
molestation. Edward testified that he wrote a letter to the district clerk in Van Zandt County, Texas
after discovering that his children were care-flighted to Dallas and also filed a motion for guardian
ad litem. Edward testified that he checked on the children’s welfare by speaking to their school
counselor and sent cards or letters to the children. However, Edward admitted that he never talked
to anyone else associated with the children until they were removed in December 2002. According
to documents in evidence, all letters from Edward to the Department or a court were sent after the
August 2002 incident.
            Tascha Snow, a licensed master level social worker or a clinical social worker, began
working with A.L.W. on May 22, 2003 after she was placed with her current foster parents. Snow
believed that A.L.W. had post-traumatic stress disorder, primarily because of the near-drowning
incident and incidents of abuse and violence that she had both suffered and witnessed. According
to Snow, A.L.W. did not have pleasant memories of her mother. A.L.W. reported multiple
incidents of physical violence and abuse by Tina, including being thrown against the wall and
kicked. A.L.W. told Snow that Edward was present during the abuse she suffered. A.L.W. further
reported that Tina was in the house partying and using drugs when she and her brother nearly
drowned. A.L.W. told Snow that she observed her mother using drugs. A.L.W. described several
different recurring nightmares to Snow, usually related to drowning and water or the police taking
away her and her brother. In Snow’s opinion, Edward did not uphold his parental duties in the past
and provide a safe, stable environment for his children.
            Megan Peterson, the daughter of Tina and Steve Peterson, testified that A.L.W. and E.L.W.
were her half-siblings. She took care of both children, including changing their diapers and feeding,
bathing, and clothing them. While Megan was living with Tina and Edward, U.S. Marshals came
to their house and threw tear gas inside. Megan testified that Edward was in the house, but ran from
authorities. At the time, Tina was pregnant with A.L.W. Janice Rodriguez Collinsworth, the family
worker for A.L.W., E.L.W., Tina, and Edward, was responsible for making service plans for both
parents. Collinsworth testified that, on August 21, 2001, Tina physically abused A.L.W. A safety
plan was developed with the Department in which the children were placed in a relative’s home and
Tina was not allowed unsupervised contact. In 2002, the Department discovered that Tina was no
longer complying with the safety plan. Janice Smith, an employee of the Van Zandt County Adult
Probation, testified that Tina was indicted in Van Zandt County for injury to a child, a third degree
felony, for an incident that occurred on August 21, 2001. Tina pleaded guilty and was sentenced
to five years deferred adjudication. 
            Viewing the evidence in the light most favorable to the finding, a reasonable fact finder
could have concluded that Edward knew Tina was a drug addict, knew that Tina endangered the
children by using drugs during her pregnancies, knew that Tina drove her car dangerously with
A.L.W. inside, and knew that Tina physically abused A.L.W., yet removed himself, but not the
children, from that environment. Further, the trial court could have found that Edward knew Tina
was convicted of injuring A.L.W. Therefore, we conclude that the evidence, viewed in the light
most favorable to the finding, was sufficiently clear and convincing that a reasonable trier of fact
could have formed a firm belief or conviction that Edward knowingly placed or knowingly allowed
his children to remain in conditions or surroundings which endangered their physical or emotional
well-being.
            Although there is conflicting evidence that Edward attempted to protect the children, that
he tried to get the children out of their situation with Tina, and that he attempted to alert authorities
after Tina’s arrest for injury to a child, the trial court could have resolved this conflict in favor of
its finding. The trial court could have found that Edward removed himself, not the children, from
the chaotic household and disregarded the risk that the children would suffer mental and physical
injuries from that environment. Although there is some disputed evidence, this evidence was not
so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its
finding and formed a firm belief or conviction that Edward knowingly placed or knowingly allowed
A.L.W. and E.L.W. to remain in conditions or surroundings which endangered their physical or
emotional well-being. Accordingly, Edward’s first and second issues are overruled.
 
Termination Under Section 161.001(1)(E)
            In his third and fourth issues, Edward contends that the evidence is legally and factually
insufficient to support a finding that he engaged in conduct or knowingly placed the children with
persons who engaged in conduct that endangered their physical or emotional well-being.
Applicable Law
            Section 161.001(1)(E) of the Texas Family Code states that the court may order termination
of the parent-child relationship if the court finds by clear and convincing evidence that the parent
has engaged in conduct or knowingly placed the child with persons who engaged in conduct which
endangers the physical or emotional well-being of the child. Tex. Fam. Code Ann. §
161.001(1)(E) (Vernon 2002). The specific danger to the child’s well-being need not be established
as an independent proposition, but may instead be inferred from parental misconduct. Boyd, 727
S.W.2d at 533; In re J.J., 911 S.W.2d at 440. Further, scienter is not required for an appellant’s
own acts under section 161.001(1)(E), although it is required when a parent places his child with
others who engage in endangering acts. In re U.P., 105 S.W.3d 222, 236 (Tex. App.–Houston
[14th Dist.] 2003, pet. denied). Finally, the need for permanence is a paramount consideration for
the child’s present and future physical and emotional needs. In re N.K., 99 S.W.3d 295, 301 n.9
(Tex. App.–Texarkana 2003, no pet.); In re M.D.S., 1 S.W.3d at 200. 
            As previously discussed, “endanger” means to expose to loss or injury or to jeopardize. 
Boyd, 727 S.W.2d at 533; In re D.M., 58 S.W.3d at 811. Subsection (E) requires us to look at the
parent’s conduct alone, including actions, omissions, or the parent’s failure to act. In re D.J., 100
S.W.3d 658, 662 (Tex. App.–Dallas 2003, pet. denied); In re D.M., 58 S.W.3d at 811. Courts look
to what the parent did both before and after the child’s birth to determine whether termination is
necessary. In re D.M., 58 S.W.3d at 812. Further, termination under subsection (E) must be based
on more than a single act or omission. In re D.M., 58 S.W.3d at 812; In re D.T., 34 S.W.3d 625,
634 (Tex. App.–Fort Worth 2000, pet. denied). A voluntary, deliberate, and conscious “course of
conduct” by the parent that endangers the child’s physical and emotional well-being is required. 
In re D.M., 58 S.W.3d at 812; In re D.T., 34 S.W.3d at 634. 
            Imprisonment is a factor to be considered by the trial court on the issue of endangerment.
Boyd, 727 S.W.2d at 533; In re M.D.S., 1 S.W.3d at 199. Mere imprisonment, standing alone, will
not constitute engaging in conduct that endangers the emotional or physical well-being of a child.
Boyd, 727 S.W.2d at 533; In re D.M., 58 S.W.3d at 812; In re M.D.S., 1 S.W.3d at 199. A parent’s
voluntary, willful, and conscious engagement in conduct that he knows may result in imprisonment
is also insufficient to support termination of parental rights. In re D.T., 34 S.W.3d at 636. 
Analysis
            In addition to the evidence previously described, Edward testified that he was imprisoned
in 1980 for burglary of a habitation when he was eighteen years old. Since that time, he has spent,
by his own admission, only three consecutive years out of prison, from 1982 to 1985. Edward
acknowledged that he violated all of his paroles and that they were all revoked. From 1983 to 1998,
Edward was arrested for or convicted of burglary of a motor vehicle, possession of a controlled
substance, possession of dangerous drugs, unauthorized use of a motor vehicle, resisting arrest,
burglary of a building, possession of amphetamine with intent to deliver, aiding and abetting,
possession of a firearm by a felon, and assault causing bodily injury. At the time of trial, Edward
was in federal prison in Texas serving a ninety-two month sentence for felon in possession of a
firearm. His statutory release date was January 1, 2005, and his projected release date was July 6,
2004. Edward testified that he last took an illegal drug in March of 1997. Edward denied hitting
Megan, Tina’s other daughter, although he admitted spanking her with a belt once. He denied ever
hitting A.L.W. However, Edward testified that he and Tina “got into it a lot,” but that he hit her no
more than ten times. 
            Snow testified that, in her professional opinion, Edward cannot provide A.L.W. with
stability because he is incarcerated and has not shown an ability to live in the community or
maintain outside of incarceration. Snow stated that Edward’s risk of recidivism is very high. 
Megan testified that, during her sixth grade year, she lived with Tina and Edward in Bedford. Tina
and Edward were in a serious fight, were evicted, and moved from hotel to hotel. According to
Megan, Edward was at home off and on. Megan witnessed violence between Tina and Edward,
observed Edward hit Tina more than once, and witnessed Edward grab Steve by the throat and
threaten to kill him. Megan testified that Edward hit her with his open hand and fist more than once
when she was thirteen or fourteen years old. Megan witnessed violence between Edward and her
older sister, Tonya, and recalled that Edward hit Tonya around her head with a pool stick. 
According to Megan, Edward would take out his frustration on A.L.W., i.e., grab her by the arms,
squeeze hard, and leave bruises. He would also spank A.L.W. and get “carried away.” Megan
admitted that most of this behavior was because he was probably on drugs.
            Viewing the evidence in the light most favorable to the finding, a reasonable fact finder
could have concluded that Edward engaged in a continuous course of conduct that he knew would
result in imprisonment, that he had been imprisoned since 1980 and had only three consecutive
years out of prison since 1980, that he abused A.L.W. and other members of the household, and that
his risk of recidivism was very high, leaving the children alone once again. Therefore, we conclude
that the evidence, viewed in the light most favorable to the finding, was sufficiently clear and
convincing that a reasonable trier of fact could have formed a firm belief or conviction that Edward
engaged in conduct or knowingly placed A.L.W. and E.L.W. with persons who engaged in conduct
which endangered their physical or emotional well-being.
            Although there is conflicting evidence that Edward was concerned about the children’s well-being and environment, the trial court could have resolved this conflict in favor of its finding. The
trial court could have found that Edward’s continuous incarcerations from a voluntary, willful
course of conduct were conditions that endangered both children’s physical or emotional well-being. Although there is some disputed evidence, this evidence is not so significant that a
reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed
a firm belief or conviction that Edward engaged in conduct or knowingly placed A.L.W. and E.L.W.
with persons who engaged in conduct which endangered their physical or emotional well-being. 
Accordingly, Edward’s third and fourth issues are overruled.



 
 
 
Best Interest of the Child
            We now turn to the trial court’s finding that termination was in the best interest of the
children. In his seventh issue, Edward argues that there is not clear and convincing evidence that
termination was in the children’s best interest. 
Applicable Law
            In determining the best interest of the child, a number of factors have been considered,
including (1) the desires of the child; (2) the emotional and physical needs of the child now and in
the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental
abilities of the individuals seeking custody; (5) the programs available to assist these individuals;
(6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or
omissions of the parent which may indicate that the existing parent-child relationship is not a proper
one; and (9) any excuse for the acts or omissions of the parent. Holley v. Adams, 544 S.W.2d 367,
371-72 (Tex. 1976).
            This list is not exhaustive, but simply indicates considerations that have been or could be
pertinent. Id. However, the best interest of the child does not require proof of any unique set of
factors nor limit proof to any specific factors. In re D.M., 58 S.W.3d at 814. The Holley test
focuses on the best interest of the child, not the parent’s best interest. Dupree v. Texas Dep’t of 
Protective & Regulatory Servs., 907 S.W.2d 81, 86 (Tex. App.–Dallas 1995, no writ). While
incarceration is a factor in determining the best interest of a child, it is not dispositive. In re C.T.E.,
95 S.W.3d 462, 466 (Tex. App.–Houston [1st Dist.] 2002, pet. denied). In determining the weight
of this factor, the court should consider the expected length of an appellant’s imprisonment and
whether it can be inferred from an appellant’s criminal conduct that he has endangered the safety
of the child. Id.
Analysis
            In addition to the evidence previously described, Edward testified that he had no desire for
drugs because that desire was replaced by the need to take care of his children. Edward believed
that, in the long term, it would be best interests of the children to live with him. Edward testified
that he first saw A.L.W. when Tina brought her to the prison for a visit. He was out of prison when
E.L.W. was born. Edward stated that the last time he was with his children outside of prison was
1998. Edward testified that, every day since he was imprisoned in 1998, he talked to A.L.W. and
E.L.W. on the telephone. His telephone calls ceased when the Department removed the children.
Edward testified that he paid child support until the children were removed. From 1999 to 2002,
he paid approximately $1,500 to $2,000 total child support for both children. After the children
were taken by the Department in 2002, he did not continue paying child support because the
Department told him that it would not be necessary. Looking back, he considered himself an addict. 
In order to change, Edward “gave [himself] over to the Lord” and began all kinds of programs and
college. He has earned a number of diplomas and certificates while incarcerated. He has taken
classes on a variety of subjects, including parenting, employment, consumer skills, drug education,
real estate, training to operate a forklift, and the Bible. While incarcerated, Edward worked for the
chaplain’s office and the prison industry. 
            Snow testified that A.L.W. was diagnosed with chronic post-traumatic stress disorder,
depressive disorder, disruptive behavior disorder, arithmic disorder, borderline intellectual
functioning, chaotic family of origin, physical abuse, and possible sexual abuse. Initially, A.L.W.
experienced severe sleeping problems, terrible nightmares, very serious behavior outbursts and fits
that included self-harm, threats of self-harm, and threats to other people’s safety. A.L.W. was also
very physically aggressive at times. Snow stated that A.L.W. showed progress with her depressive
symptoms, including depressed mood, flat affect, isolation, and withdrawing. Although A.L.W.
made progress with her disruptive behavior disorder, she did have outbursts when she experienced
anxiety. A.L.W. scored 75 on her IQ test. When Snow met her, she could not read and was at the
end of first grade. Her foster family put her in summer school and, by midsummer, A.L.W. was
reading. A.L.W. was taking Adderall for her learning disability, Risperdal for her behavior
outbursts and post-traumatic stress disorder symptoms, Trazodone for depression and sleep, and
Lexupro, an antidepressant.. Snow noted that A.L.W. did not have a significant learning disability
or emotional developmental delays that would contradict the goal of developing increased
responsibility and social skills nor was A.L.W. mentally retarded. 
            Snow testified that A.L.W. only spoke of Edward when Snow initiated the conversation.
A.L.W. told Snow that Edward had not lived with her for a long time and was a bad person who did
drugs, went to jail, and beat up her mother. According to Snow, A.L.W. had no personal history
to share regarding Edward. A.L.W. never told Snow that she wanted to live with Edward until the
past three months. A.L.W. wanted a “forever home.” Snow attributed this to A.L.W.’s very
idealistic view of a mother and a father. Snow testified that A.L.W. was in a very important
developmental stage, and the risk of continued instability in her life would mean a completely
detrimental outcome. The best type of parent for A.L.W. was a parent who was very stable
emotionally and able to handle her behavior outbursts, physical aggression, emotional aggression,
and depressive symptoms. A.L.W.’s parent would require a very high level of parenting skills. 
Edward’s past recidivism and no evidence of past stability caused Snow to believe that there was
a high chance that he would commit future crimes. Snow believed it was doubtful that Edward
could meet A.L.W.’s emotional and physical needs. In Snow’s opinion, Edward should have his
parental rights terminated because he had not shown the ability to provide a safe, protective
environment for A.L.W. or E.L.W.
            Russell Bailiff, a licensed master social worker or advanced clinical practitioner, began
working with E.L.W. in May 2003. According to Bailiff, E.L.W. suffered from some anxiety,
difficulty in learning to reciprocate with other children, moderate self-concept issues, and some
adjustment difficulties typical of children coming into foster care. E.L.W. responded very well to
therapy and gradually improved. E.L.W. indicated, on several occasions, that he missed his father,
but did not know how he looked or how he acted. In Bailiff’s opinion, E.L.W. desired a
relationship with a mother or father figure, but that it was probably nothing more than a concept. 
Bailiff disagreed that E.L.W. had a borderline intellectual functioning and opined that he should be
able to mainstream. Bailiff was hesitate to recommend risking Edward raising E.L.W. because of
his past history, including lengthy incarcerations.
            Linda Rohus had been A.L.W. and E.L.W.’s foster mother since March 5, 2003. She
testified that E.L.W. was doing better in school, went to bed well at night, took his time-outs well,
and was learning to read. A.L.W. had improved more in behavior and at school. A.L.W. was in
special education because she was so far behind and had a learning disability. According to Rohus,
A.L.W. was very street smart, not “stupid or retarded.” A.L.W.’s nightmares about the police
coming to her house and taking them away ceased. According to Rohus, E.L.W. and A.L.W. were
very close, and A.L.W. was his caretaker. Rohus testified that Edward sent cards and letters to the
children, but neither child asked to see him. According to Rohus, E.L.W. did not recognize
Edward. Rohus testified that, about ten weeks before trial, A.L.W. became very angry, out of
control, banging her head, and commenting that she wanted to kill herself. Rohus admitted A.L.W.
to East Texas Medical Center Behavior Hospital. Since the hospitalization, A.L.W.’s behavior had
improved, although she still had problems. For instance, in time out, A.L.W. must be watched
because she attempts self-harm.  
            According to Collinsworth, the Department developed a service plan with Edward and
discussed it with him by telephone. One of the goals was for Edward to use parenting practices that
met and addressed the children’s physical and emotional well-being. At that time, Collinsworth
stated that she did not know Edward’s release date. Further, the Department determined that it was
not in the children’s best interest to visit Edward in prison. Collinsworth acknowledged that
Edward stayed in contact with the Department throughout this case. According to Collinsworth,
Edward did not achieve the level of compliance necessary because he failed to demonstrate that he
could meet the children’s emotional and developmental needs. Collinsworth admitted that Edward
was unable to demonstrate the necessary parenting because he was in prison. She believed Edward
when he stated that the safety of the children was important to him. However, Collinsworth
determined that the children did not have a developed or ongoing relationship with their father. 
According to Collinsworth, neither child asked about their father unless she presented things he
sent. She would have to explain that the gifts were from Edward, not Steve, because the children
did not remember Edward. 
            In Megan’s opinion, both Tina’s and Edward’s parental rights should be terminated because
the children deserved a better life than they could give them. Jackie Winton was a counselor at
Wills Point Primary School during the time that A.L.W. and E.L.W. attended the school in 2001. 
She saw the children weekly for group counseling. Winton acknowledged that A.L.W. could not
read and that, at home, had some “pretty bad behavior problems.” Both children talked about
Edward and said that, some day, he would be back. Winton testified that Edward called her almost
weekly and sent letters and boxes of gifts to the children. Edward seemed to be concerned about
the children’s well-being, and the children looked forward to receiving communications from him. 
However, Winton did not know why Edward was in prison, what charges against him, or how many
times he had been to prison.
            Misti Loveland, a CASA worker, testified that she was personally familiar with A.L.W. and
E.L.W. A.L.W. spoke to Loveland about Edward, stating that she would be glad when she was in
the fifth grade because then she could go live with him. In Loveland’s opinion, Edward should have
the children because the children want to be with him. According to Loveland, the children should
be delivered to Edward because of his consistency in caring about them and wanting and desiring
them to be safe. She understood that Edward had been in prison for many years since the age of
eighteen, but did not know why. Loveland admitted that her attitude was influenced by her
background. Carolyn C. Howell testified that she was a volunteer at CASA and reviewed this case.
According to Howell, there was a “black hole” concerning the efforts of the Department. For
instance, she believed Edward’s continuous seeking of involvement with the children was
disregarded. According to Howell, Edward was “ruled out” because of his history. Howell
believed that Edward could live in a home that was not chaotic and believed that the support system
of his wife, Carla, was a good start for Edward’s re-entry into society. In the meeting Howell
supervised between Edward and the children, she observed them exchange unexpected genuine
affection. Both Loveland and Howell recommended that Edward’s rights not be terminated. 
            Although there is conflicting testimony regarding Edward’s care for and ability to parent the 
children, the trial court could have disregarded Loveland’s testimony that Edward should be given
the children because he showed a consistency in caring for them. The trial court could have also
disregarded Howell’s testimony that because he and the children were affectionate towards one
another in one meeting, he should retain his parental rights. Although there is some disputed
evidence, this evidence was not so significant that a reasonable trier of fact could not have
reconciled this evidence in favor of its finding and formed a firm belief or conviction that
terminating Edward’s parental rights was in the best interest of L.A.W. and E.L.W. Accordingly,
Edward’s seventh issue is overruled.
 
 
 
 
Disposition
            Having overruled the issues presented by Edward in this appeal, the judgment of the trial
court is affirmed.
                                                                                                     JAMES T. WORTHEN 
                                                                                                                 Chief Justice
 
Opinion delivered September 30, 2005.
Panel consisted of Worthen, C.J., Griffith, J., and DeVasto, J.
 
 
 
 
 
(PUBLISH)