# NO. 12-13-00301-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| | § | *APPEAL FROM THE* |
| *IN THE INTEREST OF* | | |
| | § | *COUNTY COURT AT LAW #2* |
| *J.N.G., A CHILD* | | |
| | § | *ANGELINA COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

J.S.G. appeals the termination of her parental rights. In three issues, J.S.G. challenges the order of termination. We affirm.

### BACKGROUND

J.S.G. is the mother of J.N.G., born July 25, 2012. J.L.R.[1] is the father of J.N.G. and is not a party to this appeal. On July 26, 2012, the Department of Family and Protective Services (the Department) filed an original petition for protection of J.N.G., for conservatorship, and for termination of J.S.G.'s parental rights. The Department was appointed temporary managing conservator of the child, and J.S.G. was appointed temporary possessory conservator with limited rights and duties.

At the conclusion of the trial on the merits, the trial court found, by clear and convincing evidence, that J.S.G. had engaged in one or more of the acts or omissions necessary to support termination of her parental rights. The trial court also found that termination of the parent-child relationship between J.S.G. and J.N.G. was in the child's best interest. Based on these findings,

---

[1] On October 4, 2013, the trial court found by clear and convincing evidence, that J.L.G. had engaged in one or more of the acts or omissions necessary to support termination of his parental rights, and that termination of the parent-child relationship was in the best interest of the child. Based on these findings, the trial court ordered that the parent-child relationship between J.L.R. and J.N.G be terminated.

the trial court ordered that the parent-child relationship between J.S.G. and J.N.G. be terminated. This appeal followed.

<h2 style="text-align:center">TERMINATION OF PARENTAL RIGHTS</h2>

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.).

Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2013); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the first subsection of the statute. TEX. FAM. CODE ANN. § 161.001(1) (West Supp. 2013); *Green v. Texas Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(2) (West Supp. 2013); *In re J.M.T.*, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008). The burden of proof is upon the party seeking the deprivation of parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

<h2 style="text-align:center">STANDARD OF REVIEW</h2>

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or

conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id*. at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied).

## TERMINATION UNDER SECTION 161.001(1)(E)

In her first issue, J.S.G. argues that the evidence is factually insufficient to support a finding that she engaged in conduct, or knowingly placed J.N.G. with persons who engaged in conduct, that endangered J.N.G.'s physical or emotional well being.

## Applicable Law

The court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangers the physical or emotional well being of the child. TEX. FAM. CODE ANN. § 161.001(1)(E) (West Supp. 2013). The specific danger to the child's well being need not be established as an independent proposition, but may instead be inferred from parental misconduct. *Tex. Dep't of Human Svcs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re J.J.*, 911 S.W.2d at 440. Scienter is not required for an appellant's own acts under Section 161.001(1)(E), although it is required when a parent places her child with others who engage in endangering acts. *In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Finally, the need for permanence is a paramount consideration for the child's present and future physical and emotional needs. *In re N.K.*, 99 S.W.3d 295, 301 n.9 (Tex. App.—Texarkana 2003, no pet.); *In re M.D.S.*, 1 S.W.3d 190, 200 (Tex. App.—Amarillo 1999, no pet.).

"Endanger" means to expose to loss or injury or to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re D.M.*, 58 S.W.3d 801, 811 (Tex. App.—Fort Worth 2001, no pet.). It is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Boyd*, 727 S.W.2d at 533; *In re J.J.*, 911 S.W.2d at 440. Subsection (E) requires us to look at the parent's conduct

alone, including actions, omissions, or the parent's failure to act. *In re D.J.*, 100 S.W.3d 658, 662 (Tex. App.—Dallas 2003, pet. denied); *In re D.M.*, 58 S.W.3d at 811. Termination under subsection (E) must be based on more than a single act or omission. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). A voluntary, deliberate, and conscious "course of conduct" by the parent that endangers the child's physical and emotional well being is required. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d at 634. Further, in considering whether a relevant "course of conduct" has been established, a court properly may consider both actions and inactions occurring both before and after a child's birth. *In re S.M.*, 389 S.W.3d 483, 491-92 (Tex. App.—El Paso 2012, no pet.).

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well being of a child. *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Evidence of criminal conduct, convictions, and imprisonment and its effect on a parent's life and ability to parent may establish an endangering course of conduct. *In re S.M.*, 389 S.W.3d at 492. Imprisonment alone does not constitute an endangering course of conduct but it is a fact properly considered on the endangerment issue. *Id.* (citing *Boyd*, 727 S.W.2d at 533-34). Conduct which routinely subjects a child to the probability that she will be left alone because the parent is once again jailed, whether because of the continued violation of probationary conditions or because of a new offense growing out of a continued use of illegal drugs, endangers both the physical and emotional well being of a child. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied). Further, evidence as to how a parent has treated another child is relevant regarding whether an endangering "course of conduct" under has been established. *See In re S.M.*, 389 S.W.3d at 492.

**Analysis**

The evidence at trial demonstrated that this case began in March 2011. At that time, J.S.G. was using and selling PCP and cocaine, and had two young children. The Department investigator stated that J.S.G.'s younger child woke up crying, could not stop, and then stopped breathing. J.S.G. took the child to the hospital. According to the investigator, the child tested positive for PCP or cough medicine, and was life-flighted to Texas Children's Hospital in Houston. Further, J.S.G. tested positive for PCP and cocaine, and her older child tested positive for cocaine. The Department conducted an emergency removal of both children based on the

drug test results, neglect, and abuse. The investigator believed that the older child was exposed to PCP or ingested it, resulting in a substantial risk to the child.

J.S.G. was charged with endangering a child and was sentenced to deferred adjudication community supervision. The terms of her community supervision included six months of SAFPF, a "lockdown" substance abuse counseling program offered through the Texas Department of Criminal Justice. Her community supervision also included two years of drug court. J.S.G. was in SAFPF for six months and a rehabilitation or halfway house for ninety days. She went home on December 30, 2011. At that point, J.S.G. entered drug court.

However, J.S.G. relapsed on New Year's Eve 2011—two days after she was released from the halfway house. That night, she went to a club and used PCP. She tested positive for PCP on January 3, 2012, and was sent to jail. J.S.G. admitted that she was six weeks pregnant when she tested positive, but did not find out until she was in jail. According to the Department supervisor, J.S.G. became pregnant while at the halfway house and the father was a known drug user. Because J.S.G. was pregnant when she was sentenced, she was sent to a jail facility for pregnant inmates for almost eight months until the birth of J.N.G. on July 25, 2012.

On October 1, 2012, J.S.G. began a four month long relapse SAFPF program. She was released on February 1, 2013, and began drug court. J.S.G. did not successfully complete this program because she continued to have contact with V.H., which violated the terms of her community supervision. According to the Department supervisor, V.H. was on felony community supervision for aggravated assault with a deadly weapon and reportedly, "[drank] like a fish" at weekend parties at J.S.G.'s mother's house. When J.S.G. was at the SAFPF lockdown facility and at the halfway house in 2011, J.S.G.'s mother allowed V.H. to transport J.S.G.'s older children to the SAFPF facility to see her. The Department specifically told J.S.G. to stay away from V.H. when she was at the halfway house, including indirect contact such as Facebook and other social networking sites. At the time, J.S.G. denied communicating with V.H., but J.S.G.'s mother admitted that V.H. visited J.S.G. at SAFPF in November and December 2011. Also, J.S.G.'s community supervision officer confronted her with pictures on her Facebook page of a family party that she and V.H. attended. J.S.G. finally admitted that she had contact with V.H. and visited him in jail after being told not to do so. At trial, J.S.G. admitted that V.H. visited her while she was in SAFPF, that she talked to him on the telephone

and through Facebook, and that she was at a party he attended. However, she denied knowing that V.H. had a criminal history.

As a result of her community supervision violation, J.S.G. was sent to jail in March 2013. She was in ISF (an "Intermediate Sanction Facility") for three months and was released on August 14, 2013. On the weekend before trial, J.S.G. accepted an invitation through Facebook to a party at a club. She decided not to go, and her decision to accept the invitation was addressed by the Department before trial.

J.S.G. admitted that she had a drug problem, but stated that she has been clean since January 2012. She admitted that relapsing and doing drugs was not good for her children. She did not believe that "once an addict, always an addict" was a relevant phrase. At trial, her community supervision officer stated that J.S.G. was a month and a half into a two year drug court program. J.S.G. has attended meetings and counseling since her release. However, the Department supervisor did not believe that J.S.G. internalized and learned from her recovery, even though she made some positive steps. She also stated that the largest contribution to J.S.G.'s sobriety was that she had been incarcerated twenty-one out of the last thirty months. According to the Department supervisor, J.S.G.'s mother did not show any remorse after allowing the older children to be around V.H., disregarded court orders, and minimized J.S.G.'s behaviors. J.S.G. and her family did not show "protective" capabilities around her children.

J.S.G. admitted that as a condition of her community supervision, she was not to have possession of a child unsupervised. She testified that while living with her sister before trial, she was alone with her sister's child. She explained that the child's father was in the bedroom asleep, but she admitted that he was not watching or supervising her.

In summary, the evidence shows that J.S.G. caused her two older children to test positive for illegal drugs while in her care, which resulted in one of them being hospitalized. She also continually engaged in conduct that violated the conditions of her community supervision such as contacting V.H. after being specifically told not to do so and using PCP only two days after being released from a halfway house. As a result, she spent most of J.N.G.'s life incarcerated. She also appeared to admit at trial that she recently violated conditions of her community supervision by accepting an invitation to a party at a club and being in possession of her sister's child while unsupervised. In contrast, J.S.G. points out that she did not have possession of her daughter after her birth and was granted only supervised visitations at the Department's office

after being released in February 2013. Consequently, she asserts that she could not have conducted herself in any way that emotionally or physically endangered J.N.G.

Although there is evidence that conflicts with the trial court's findings, this evidence is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that J.S.G. engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered her physical or emotional well being. Therefore, we hold that the evidence is factually sufficient to support termination of J.S.G.'s parental rights under Section 161.001(1)(E). Accordingly, we overrule J.S.G.'s first issue regarding Section 161.001(1)(E).

## PLACEMENT

In her third issue, J.S.G. contends that the trial court failed to permit her sister to have custody of J.N.G. in violation of Sections 261.201(e) and 264.752 of the Texas Family Code.

### Background

A home study concerning placement of J.N.G. with J.S.G.'s sister was conducted on July 23, 2013. The Department did not recommend placement of J.N.G. with J.S.G.'s sister because of concerns regarding "protective capacities." Approximately one week before trial, J.S.G. filed a motion to remove J.N.G. from her foster home and place her with J.S.G.'s sister. In the motion, J.S.G. contested the home study and the Department's failure to recommend the requested placement. At trial, the court stated it would consider whether placement of J.N.G. should be with a family member or foster care if termination of J.S.G.'s parental rights was not ordered. At the conclusion of the trial, the court denied the motion for J.N.G. to be placed with J.S.G.'s sister and ordered that the current foster home placement be maintained because J.S.G.'s parental rights were terminated.

### Standard of Review and Applicable Law

The court shall place a child removed from the child's custodial parent with the child's noncustodial parent or with a relative of the child if placement with the noncustodial parent is inappropriate, unless placement with the noncustodial parent or a relative is not in the best interest of the child. *See* TEX. FAM. CODE ANN. § 262.201(e) (West Supp. 2013). In enabling the State to give preference to a relative of the child if placement with the noncustodial parent is inappropriate, the trial court has broad discretion in determining the best interest of the child.

*See **In re S.P.***, 168 S.W.3d 197, 211 (Tex. App.—Dallas 2005, no pet.); *see also* TEX. FAM. CODE ANN. § 153.002 (West 2008) ("The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child."). A trial court abuses its discretion when it acts arbitrarily or unreasonably, and without reference to guiding rules or principles. ***Downer v. Aquamarine Operators, Inc.***, 701 S.W.2d 238, 241-42 (Tex.1985).

<u>Analysis</u>

According to J.S.G.'s caseworker, placement with J.S.G.'s sister's home study was not recommended for two main reasons. First, J.S.G.'s sister was not deemed to be protective or able to stay away from her family. J.S.G.'s caseworker stated that the sister allowed her parents to babysit her child even though they had extensive criminal and Department history. J.S.G.'s sister admitted that her mother would look after her child between the time the child arrived home from school and she arrived home from work. She believed that she could turn family members away from her house if it were in J.N.G.'s best interest. However, she appeared to be resistant to the idea of her mother not being able to be around J.N.G., stating that she "possibly" would not have a choice. Further, J.S.G.'s sister did not believe that J.S.G. was a danger to her children. She was aware that J.S.G.'s children tested positive for drugs, but believed that somebody J.S.G. "was hanging around with," and not J.S.G., was responsible. J.S.G.'s sister also admitted leaving J.S.G. alone with her own child "numerous times" since she was released in August 2013.

Second, J.S.G.'s sister did not tell the housing authority or other agencies about additional members of her household or additional income. J.S.G.'s sister and the sister's boyfriend claimed to have lived together for nine years. At the time of the home study, J.S.G.'s sister was unemployed and her boyfriend worked for a concrete company. According to the housing authority, J.S.G.'s sister's rent was based on income and household size, and she listed her income as unemployment and the household size as including her and her child. J.S.G.'s caseworker stated that there were other members of the household that were not being reported as well as other income. Her concern was that J.S.G.'s sister could possibly lose her housing and other benefits that she received if the housing authority and other agencies knew that her boyfriend lived in the house and received an income. However, J.S.G.'s sister stated that she told the housing authority that her boyfriend lived in the house with her and reported his income

"awhile back." But she admitted that was less than a year before trial. She also stated that her boyfriend did not begin living with her until the beginning of the year.

From the evidence, the trial court reasonably could have found that J.S.G.'s sister would not be protective of J.N.G., that she would not prevent J.S.G. and other family members with criminal or Department history from having contact with J.N.G., and that she may have been untruthful to the housing authority and other agencies regarding her household and income, which could result in her losing her house and other benefits. Based on these findings, the trial court reasonably could have determined that placement with J.S.G.'s sister was not in J.N.G.'s best interest. *See* TEX. FAM. CODE ANN. § 262.201(e). Therefore, we hold that the trial court did not abuse its discretion in denying J.S.G.'s motion and failing to place J.N.G. with J.S.G.'s sister. Accordingly, we overrule J.S.G.'s third issue.

## DISPOSITION

Having overruled J.S.G.'s first and third issues, we ***affirm*** the judgment of the trial court.[2]

### BRIAN HOYLE
Justice

Opinion delivered January 31, 2014.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(PUBLISH)

---

[2] Because we have concluded that the evidence is legally and factually sufficient to support termination of J.S.G.'s parental rights under subsection (1)(E), we need not address J.S.G.'s second issue regarding subsection (1)(O). *See* TEX. FAM. CODE ANN. § 161.001(1); TEX. R. APP. P. 47.1.



# COURT OF APPEALS
# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS
# JUDGMENT

## JANUARY 31, 2014

## NO. 12-13-00301-CV

## IN THE INTEREST OF J.N.G., A CHILD

Appeal from the County Court at Law #2

of Angelina County, Texas. (Tr.Ct.No. CV-01609-12-07)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*