# NO. 12-14-00171-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF E. R.,* | § | *APPEAL FROM THE* |
| *A CHILD* | § | *COUNTY COURT AT LAW* |
| | § | *CHEROKEE COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

R.S. appeals the termination of her parental rights.  In six issues, she challenges the order of termination. We affirm.

## BACKGROUND

R.S. is the mother of E.R., born November 23, 2006. R.R. is the father of E.R. and is not a party to this appeal.  On May 1, 2013, the Department of Family and Protective Services (the Department) filed an original petition for protection of the child, for conservatorship, and for termination of R.S.'s parental rights.  The Department was appointed temporary managing conservator of the child, and R.S. was appointed temporary possessory conservator with limited rights and duties.

At the conclusion of the trial on the merits, the trial court found, by clear and convincing evidence, that R.S. had engaged in one or more of the acts or omissions necessary to support termination of her parental rights under subsections (D), (E), and (O) of Texas Family Code Section 161.001(1).  The trial court also found that termination of the parent-child relationship between R.S. and E.R. was in the child's best interest.  Based on these findings, the trial court ordered that the parent-child relationship between R.S. and E.R. be terminated.  This appeal followed.

## TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.).

Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West 2014); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the first subsection of the statute. TEX. FAM. CODE ANN. § 161.001(1) (West 2014); *Green v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(2) (West 2014); *In re J.M.T.*, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014). The burden of proof is upon the party seeking the deprivation of parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

## STANDARD OF REVIEW

When confronted with both a legal and a factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981); *In re M.D.S.*, 1 S.W.3d 190, 197 (Tex. App.–Amarillo 1999, no pet.). In conducting a legal sufficiency review, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm

belief or conviction that its findings were true. ***In re J.F.C.***, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. ***Id***.

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. ***In re C.H.***, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. ***Id***. at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. ***In re J.F.C.***, 96 S.W.3d at 266. The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. ***Nordstrom v. Nordstrom***, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied).

<u>**TERMINATION UNDER SECTION 161.001(1)(E)**</u>

In her third and fourth issues, R.S. argues that the evidence is legally and factually insufficient to support a finding that she engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangered the child's physical or emotional well being.

<u>**Applicable Law**</u>

The court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangers the physical or emotional well being of the child. TEX. FAM. CODE ANN. § 161.001(1)(E) (West 2014). The specific danger to the child's well being need not be established as an independent proposition, but may instead be inferred from parental misconduct. ***Tex. Dep't of Human Svcs. v. Boyd***, 727 S.W.2d 531, 533 (Tex. 1987); ***In re J.J.***, 911 S.W.2d at 440. Scienter is not required for an appellant's own acts under Section 161.001(1)(E), although it is required when a parent places her child with others who engage in endangering acts. ***In re U.P.***, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Finally, the need for permanence is a paramount consideration for the child's

3

present and future physical and emotional needs. *In re N.K.*, 99 S.W.3d 295, 301 n.9 (Tex. App.—Texarkana 2003, no pet.); *In re M.D.S.*, 1 S.W.3d at 200.

"Endanger" means to expose to loss or injury or to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re D.M.*, 58 S.W.3d 801, 811 (Tex. App.—Fort Worth 2001, no pet.). It is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Boyd*, 727 S.W.2d at 533; *In re J.J.*, 911 S.W.2d at 440. Subsection (E) requires us to look at the parent's conduct alone, including actions, omissions, or the parent's failure to act. *In re D.J.*, 100 S.W.3d 658, 662 (Tex. App.—Dallas 2003, pet. denied); *In re D.M.*, 58 S.W.3d at 811. Termination under subsection (E) must be based on more than a single act or omission. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). A voluntary, deliberate, and conscious "course of conduct" by the parent that endangers the child's physical and emotional well being is required. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d at 634.

A parent's use of narcotics and its effect on her ability to parent may qualify as an endangering course of conduct. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *see also In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Further, a parent's illegal drug use can support termination for endangerment because it exposes the child to the possibility that the parent may be impaired or imprisoned. *Melton v. Tex. Dep't of Family & Protective Svcs.*, No. 03-08-00168-CV, 2010 WL 668917, at *5 (Tex. App.—Austin Feb. 25, 2010, no pet.) (mem. op.). A parent's repeated engagement in illegal drug activity or repeatedly associating with known criminals after agreeing not to do so in a service plan for reunification with her child may be considered in an analysis of whether clear and convincing proof exists of voluntary, deliberate, and conscious conduct that endangered the well being of her child. *See In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.).

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well being of a child. *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.); *In re R.W.*, 129 S.W.3d at 739. Evidence of criminal conduct, convictions, and imprisonment and its effect on a parent's life and ability to parent may establish an endangering course of conduct. *In re S.M.*, 389 S.W.3d 483,492 (Tex. App.–El Paso 2012, no pet.). Imprisonment alone does not constitute an endangering course of conduct, but it is a fact properly considered on the endangerment issue. *Id.* (citing *Boyd*, 727

4

S.W.2d at 533-34). Conduct that routinely subjects children to the probability that they will be left alone because the parent is once again jailed, whether because of the continued violation of supervisory conditions or because of a new offense growing out of a continued use of illegal drugs, endangers both the physical and emotional well being of the children. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

**The Evidence**

The initial investigation by the Department began on April 16, 2013, when the police received reports of a prowler next door to R.S.'s residence. Troy Ansley, a sergeant with the Alto Police Department, testified that he discovered R.S. and her paramour, H.W., sitting on the front porch of her residence. He stated that there was an open beer container and a cup that smelled of a fruit flavored alcohol on the porch. Ansley also noticed that H.W. was a minor and exhibited signs of intoxication—bloodshot eyes, slurred speech, and an extremely scattered thought process.

It was apparent that R.S. was having a party, and Ansley discovered that, with one exception, the individuals attending the party were between thirteen to twenty years old. Most of them were holding alcoholic beverages, and all of them had been consuming alcohol. R.S. explained that she did not expect minors to show up, but still allowed them to drink in her home. She said that she was trying to be a "cool mom." Ansley described the house as being "in disarray" and "extremely smoky," "like a fog" that filled up the entire kitchen and living room area. Numerous containers of alcohol, including beer and hard liquor, were on the kitchen counters. One of the minors, E.R.'s babysitter, told him that E.R. was sleeping in the back room. The babysitter brought E.R. into the living room where Ansley noted that she was congested and not breathing very well.

Aaron Warren, a Department investigator, testified that he went to R.S.'s house the day after the party. Neither R.S. nor E.R. was there. He eventually located E.R. at her maternal grandmother's house, and she appeared to be sick. The maternal grandmother had taken the child to the emergency room. Warren testified that about fifteen or twenty minutes after he began talking to E.R.'s maternal grandmother, R.S. and H.W. came "flying" in the door. R.S. and H.W. became belligerent and very upset after Warren introduced himself. R.S. refused to cooperate and would not allow him to go to her house as part of his investigation.

After a hearing, E.R. was removed from R.S.'s home and was eventually placed in foster care. Christina Autry, a Department caseworker, testified that she was assigned to R.S.'s case on April 30, 2013. R.S. tested positive for methamphetamines through a hair follicle test after a hearing at the beginning of the case, but had approximately ten negative drug tests after that time. R.S. did not attend any Narcotics Anonymous or Alcoholics Anonymous meetings after August 2013 and did not complete her assessment with the East Texas Counsel on Alcoholism and Drug Abuse (ETCADA). However, she successfully completed an intensive outpatient drug treatment program. R.S. admitted having a drug problem and using drugs for about two months before the hearing, but said she had abstained from drugs since that date. According to Warren, E.R. stated that her mother, her minor brother, and her mother's paramour, H.W., smoked marijuana all the time and that R.S. smoked another "funny smelling" thing. R.S. denied smoking marijuana with H.W. and her older son at one point, and then admitted smoking marijuana with her older son and smoking methamphetamine with H.W. Autry noted that R.S. had not submitted to drug testing since February 19, 2014, because she was jailed in March 2014.

R.S. completed a parenting class and consistently attended visitations with E.R. However, she did not obtain and maintain a stable home and income. She had three jobs during the course of the case, had poor attendance, and was fired from two of those jobs. R.S. found it difficult to maintain a job along with the meetings and visitations required by her family service plan even though she was diligent about finding work. She had lived in six different places since April 2013, including with friends and in an apartment from which she was evicted. Eviction proceedings were commenced against R.S. in February 2014, regarding her current apartment, and later, her belongings were confiscated from that apartment.

R.S. was requested not to associate with known criminals as part of her family service plan and was ordered to have "no contact" with H.W. pursuant to the temporary orders following the adversary hearing and the family service plan. She was also told on "numerous occasions" not to have contact with H.W. However, she did not comply.

On two occasions, Autry went to R.S.'s apartment on an unannounced visit. On the first visit, R.S. was not present, but a man was in her apartment to "protect" it from another man who was supposed to pick up his clothes that were outside the apartment door. That man identified himself through an offender's card, and said he had recently been released from prison and was

on parole for a "home invasion." A criminal check revealed that he had a lengthy criminal history, including two burglaries of a habitation, theft of a firearm, numerous misdemeanor thefts, forgery of a financial instrument, assault, aggravated assault with a deadly weapon, assault causing bodily injury to a family member, and prohibited weapons. He was currently on parole until 2020.

On the next unannounced visit, Autry discovered R.S. along with two other men in her apartment. R.S. identified the first man as having a different surname than the one he gave Autry. A criminal check on the correct surname revealed that he had several felony charges and was currently serving ten years of community supervision. Autry also discovered a man hiding in a bedroom closet. The man did not have any identification, but R.S. identified him as "Billy." After Autry was shown H.W.'s mugshot a few days later, she determined that "Billy" was H.W.

H.W. had a lengthy criminal history including an arrest for sexual assault, arrests for numerous drug charges, arrests for other minor charges, and pending criminal charges. R.S. admitted that H.W. was hiding in the closet because she knew he was not supposed to be in her apartment. She knew E.R. would not be in any danger from H.W. because he "explained" the circumstances behind his arrest for sexual assault. But she also claimed not to have known about the circumstances of the sexual assault incident until after E.R. was removed from her home. R.S. and H.W. were arrested together for possession of a controlled substance, a third degree felony, on March 11, 2014.

When asked why she could not stay away from H.W. if that was the one thing standing in the way of getting E.R. back, R.S. stated that they were "friends." She admitted that she and H.W. had a sexual relationship until they were both jailed in March 2014. R.S. conceded that it looked like she was choosing H.W. over her child. However, she stated that she would stay away from all of the people who could injure E.R. or be a bad influence on her.

Larry Wilburn, a licensed professional counselor, testified that he treated R.S. twice a month from June 28, 2013, through February 2014. He explained that R.S. was unable to successfully complete counseling because she did not meet the treatment goals. Her treatment goals included setting boundaries so that she would not be around at-risk people who could put her child at risk, to stay clean, to provide a safe and financially stable environment, and to participate in services. He stated that R.S. recognized that she had a drug problem, that drug use was not appropriate around children, and that the alcohol use in her home was inappropriate.

Even though R.S. stayed clean, held a job, and participated in services, she had ongoing problems with being around at-risk people and not complying with the rules. Wilburn stated that R.S. did not demonstrate changes in her judgment, decision making, complying with the rules, and being around positive people. For instance, he said, R.S. bought a necklace for her older son that had a marijuana leaf on it. Wilburn was concerned because of R.S.'s history of substance abuse and her judgment in buying the gift.

Wilburn was also concerned because he had information that R.S. continued to be around persons who used drugs and participated in criminal activities and, therefore, continued to be "a risk." He discharged R.S. in February 2014 due to a lack of progress and her subsequent confinement in jail. He did not believe that R.S. could provide permanency and stability for E.R. at the time of trial. Wilburn testified that R.S. was at a "medium to high risk" to children based on her pattern of behavior as of February 2014. R.S. believed she had the ability to provide a safe, nurturing environment for E.R. once she was released from jail. Autry and the CASA volunteer recommended that R.S.'s parental rights to E.R. be terminated.

## Conclusion

Viewing the evidence in the light most favorable to the finding, the trial court could have determined that R.S. allowed minors to drink alcohol in her house, had a drug problem, tested positive for methamphetamine at the beginning of the case, smoked marijuana with her older son, and smoked methamphetamine with her paramour, H.W. She also admitted that she was currently in jail after being charged with possession of a controlled substance, a third degree felony. Therefore, the trial court also could have found that R.S.'s actions exposed E.R. to the possibility that R.S. may be impaired or imprisoned. *See Melton*, 2010 WL 668917, at *5.

R.S. continued to have a relationship with H.W., a known criminal who had been charged with sexual assault, even though she was ordered to have "no contact" with him. She failed to acknowledge that E.R. could be in danger from H.W. because he "explained" the circumstances behind his sexual assault arrest. H.W. was also arrested, along with R.S., for possession of a controlled substance, which indicated that their relationship was ongoing. R.S. continued to associate with other persons who participated in criminal activities, allowing them into her house. She had a continuing problem with being around at-risk persons, demonstrating a lack of judgment and a failure to comply with the rules. Because R.S. decided to continue a relationship with H.W. and associate with other known criminals during the pendency of this case and after

8

being ordered not to do so by the trial court and family service plan, the trial court could have considered R.S.'s decisions in its finding that she engaged in conduct that endangered the child's physical or emotional well being. *See In re T.N.*, 180 S.W.3d at 383.

The evidence also demonstrated that R.S.'s home life was unstable because she was unable to keep a steady home or job. She lived in at least six different places during the pendency of the case and was evicted from at least two apartments. R.S. was also in jail at the time of trial. The trial court could have found that R.S.'s unstable home life and possible incarceration subjected E.R. to a life of uncertainty and instability that endangered her physical and emotional well being. *See In re M.R.J.M.*, 280 S.W.3d at 503; *In re R.W.*, 129 S.W.3d at 739.

R.S. stated that she believed she had the ability to provide a safe, nurturing environment for E.R. once she was released from jail. She also had at least ten negative drug tests during the pendency of the case. The evidence showed that R.S. tried to find work, and consistently attended visitations with E.R. Although this evidence conflicts with the trial court's findings, it is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that R.S. engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangered her physical or emotional well being. Therefore, we hold that the evidence is legally and factually sufficient to support termination of R.S.'s parental rights under Section 161.001(1)(E). Accordingly, we overrule R.S.'s third and fourth issues.

## HEARSAY

In her sixth issue, R.S. argues that the trial court erred by admitting the hearsay statement of the child without conducting a hearing pursuant to Section 104.006 of the Texas Family Code, and that error was harmful.

A statement made by a child younger than twelve years that describes alleged abuse against the child is admissible as evidence if, in a hearing conducted outside the presence of the jury, the court finds that the time, content, and circumstances of the statement provide sufficient indications of the statement's reliability and the child testifies or is available to testify or the court determines that the use of the statement in lieu of the child's testimony is necessary to protect the child's welfare. *See* TEX. FAM. CODE ANN. 104.006 (West 2014). In other words, the

9

statute sets forth the requirements for the trial court to determine whether a child's statement is admissible through another witness in certain circumstances. *See In re L.M.*, No. 10-11-00276-CV, 2012 WL 1123898, at *2 (Tex. App.—Waco Apr. 4, 2012, pet. dism'd w.o.j.) (mem. op.). At issue is an outcry statement that E.R. made. Investigator Warren testified that E.R. said her mother, H.W., and R.S.'s older son smoked marijuana all the time and that her mother smoked another "funny smelling" thing.

R.S. admits in her brief that, at trial, her counsel did not object to the mention of the alleged outcry statement. Although she states that her lack of an objection "does not relieve the trial court of the mandatory requirement for a reliability hearing," she does not cite any authority to support her position. Further, the record does not reflect that the trial court was ever requested to conduct a hearing pursuant to Section 104.006.

As a predicate to presenting a complaint on appeal, the complaining party must have preserved the error at trial by a proper request, objection, or motion stating the grounds for the ruling that the party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, and then securing a ruling on the request, objection, or motion. *See* TEX. R. APP. P. 33.1(a)(1)(A), (2). Thus, in order to preserve this complaint for appeal, R.S. was required to present her request to the trial court and to obtain a ruling on that request. *See In re L.M.*, 2012 WL 1123898, at *2. She did not do so and, therefore, has waived this issue on appeal. Accordingly, we overrule R.S.'s sixth issue.

## DISPOSITION

Having overruled R.S.'s third, fourth, and sixth issues, we ***affirm*** the judgment of the trial court.[1]

**JAMES T. WORTHEN**
Chief Justice

Opinion delivered December 10, 2014.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(PUBLISH)

---

[1] Because we have concluded that the evidence is legally and factually sufficient to support termination of R.S.'s parental rights under subsection (1)(E), we need not address R.S.'s first, second, and fifth issues regarding subsections (1)(D) and (1)(O). *See* TEX. FAM. CODE ANN. § 161.001(1); TEX. R. APP. P. 47.1.



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**DECEMBER 10, 2014**

**NO. 12-14-00171-CV**

**IN THE INTEREST OF E. R., A CHILD**

Appeal from the County Court at Law

of Cherokee County, Texas (Tr.Ct.No. 2013-05-0334)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*